IVOR B. CLARK COMPANY OF TEXAS, INC., et al., Plaintiff,

v.

SOUTHERN BUSINESS AND INDUS-TRIAL DEVELOPMENT COM-PANY, Defendant.

Civ. A. No. 72J–157(N).

United States District Court, S. D. Mississippi, Jackson Division.

Oct. 24, 1974.

James Leon Young, Jackson, Miss., for plaintiff.

Robert H. Weaver, Jackson, Miss., for defendant.

## MEMORANDUM OPINION

NIXON, District Judge.

### ISSUES OR CONTENTIONS

This diversity suit seeks recovery of a $201,000.00 brokerage fee with interest which the defendant allegedly owes plaintiffs for two stand-by loan commitments of $6,000,000 and $4,050,000 for a construction project issued by an investment lender, B. F. Saul Real Estate Investment Trust (Saul) on June 25, 1971 and January 13, 1972, respectively. The primary basis for plaintiffs' claim is a written contract entered into between the plaintiff, General Mortgage Securities Corporation (General) and the defendant, Southern Business and Industrial Development Corporation (Southern) on January 22, 1971 (Ex. G–1), and a subsequent oral agreement between the defendant and plaintiffs. In the alternative, plaintiffs contend they are entitled to a brokerage fee on at least one of the two above commitments, or to a reasonable fee on the $4,050,000 commitment on a quantum meruit basis.

In answer, the defendant, Southern, denies liability to both plaintiffs, contending that General at no time obtained for it a loan commitment in accordance with the terms specified in the written contract and that this agreement either expired or was expressly or impliedly cancelled by the defendant prior to the time that any other commitment was obtained. Southern further contends that the plaintiff, Ivor B. Clark Company of Texas (Clark) failed to obtain for it a firm $6,000,000 fundable or bankable commitment and thereafter abandoned any efforts to do so prior to the time that the $4,050,000 commitment was issued. The defendant also alleges that the $4,050,000 commitment from Saul was a new and independent com-

mitment obtained by others than the plaintiffs and not an amendment of the previous $6,000,000 commitment. Lastly, Southern contends that General and Clark, by negotiating for a stand-by commitment for the construction of the defendant's Hilton Hotel in Jackson, Mississippi, were doing business in the State as foreign corporations without having first qualified to do so pursuant to the laws of the State of Mississippi, and thus barred from bringing this action.

## THE FACTS

The defendant, a Mississippi corporation, with its domicile in Jackson, Mississippi, was incorporated on February 28, 1968 and made several real estate investments, including the building of an office building in Jackson and a Ramada Inn Motel in Biloxi. It then purchased and leased property on North State Street in Jackson for the construction of a Hilton Hotel and received a franchise or "Hilton License Agreement" therefor. They then commenced construction of a 225-room hotel on the site with funds raised by public sales of stock and a construction loan commitment issued by the Investors Diversified Savings Mortgage Corporation of Minneapolis, Minnesota (IDS) to be disbursed through the Mississippi Valley Title Insurance Company. The construction of this hotel was contracted, without performance bond, to Earl Allen, a stockholder of defendant.

Southern experienced difficulty in obtaining a permanent loan commitment for this project, and in December, 1969 its directors authorized the acceptance of a $3,000,000 stand-by commitment at a 6% discount, with an additional 4% discount for a second year, a three year discount upon closing, 12% interest per annum, plus 25% of the gross room income above 75%. On March 12, 1970, Southern's directors authorized its executive committee to accept a permanent loan commitment and an interim loan commitment at a

rate 15% per annum plus a 1% discount.

Subsequent to the commencement of construction, it became apparent that the defendant under estimated its costs, and by July, 1970, its construction lender, IDS, and its disbursing agent, Mississippi Valley, began making demands on the defendant and threatened foreclosure. Earl Allen's construction contract was terminated by authority of Southern's Board of Directors, and there was a shake-up or change in management. It then had a feasibility study made by experts, and based on their recommendation, decided to build a 375-room hotel instead of the 225 room one originally conceived and planned. On September 29, 1970, Southern's directors authorized its officers to make efforts toward obtaining financing for the enlarged structure, which they did by first employing different architects who redesigned it and obtained cost estimates therefor. In November, 1970, IDS advised Southern that it would make no more advances on its construction loan until a permanent loan commitment had been obtained for the enlarged structure, and made demand for payment of past due interest.

The defendant's officers began efforts to obtain financing, and one Bill Williams, an independent broker of Jackson, informed Jacques L. Fortier, the president of General, an established mortgage brokerage firm in New Orleans, Louisiana, of the defendant's desire. At this time the defendant's project was in bad shape since construction had stopped and liens had been filed against the project. Fortier went to Jackson and met with Charles "Chuck" Wynn, who at all times herein was the president and managing agent of the defendant, and another member of its Board. Discussion was had concerning the desired commitment and required brokerage fee.

On January 22, 1971, the defendant entered into a written agreement with General acting through its president,

Fortier, which was in two parts (Ex. G–1), the first consisting of one page and relating to the agreed brokerage fee and the other, consisting of three pages dealing with the commitment, including the investment lender's fee or discount and interest to be charged.

The one page brokerage fee contract which gave General exclusive authorization to make application of an interim and permanent first mortgage loan in the amount of $6,500,000, to one or more lending institutions of its selection, provided that Southern would pay General a 2% brokerage fee on the amount of the loan commitment at the time of its delivery in accordance with stated terms i. e., for a period of ten years with interest of not more than 9.5% per annum and a constant payment of 10.50%. This contract further provided:

> 5. We agree that the lending institution providing the financing of the subject loan may be interested in either interim or long-term financing of various other projects. In view of the fact that contact between this lending institution and ourselves was procured and arranged by you, we agree to pay you the same percentage fee as provided in Paragraph 6 below of the loan amount of any financing which, within thirty-six (36) months of this date, might be committed or paid to us, or any person or entity affiliated with, associated with, owned by or owning, or controlled or controlling us."

> "6. . . . Your fee shall be deemed to be earned upon receipt by us of a loan commitment with the terms described in Paragraph 2 above or with such other terms as may be accepted by us.

Paragraph 14 of the three-page agreement provides in part:

> "This application is subject to the following conditions:

> 14. We herewith deposit with you in escrow the sum of $3,000.00 as a good faith deposit. Said sum will be refunded without interest and less any traveling expenses or other direct expenses, in the event you do not deliver a loan commitment as herein described, within 30 days, expenses not to exceed $250.00."

General then obtained numerous documents from Southern, including an MAI appraisal, financial statement and feasibility report and began contacting various lending institutions throughout the United States without any success because of the tight money market. Fortier then talked to Howard S. Barksdale of Houston, Texas, the vice-president and manager of the plaintiff, Clark, which was an individually owned mortgage service and placement corporation incorporated in the State of Texas with its prinicipal office in Houton. Barksdale was at once interested because he had relatives living in Jackson, Mississippi, had read of the dynamic growth of Jackson and had obtained loans from John Hancock Mutual Life Insurance Company (John Hancock) for several large motel construction projects throughout the United States. Fortier and Barksdale orally agreed that Clark would receive one-half (½) of the 2% brokerage fee provided for in the written contract between General and Southern, that is, 1% of the loan commitment. Clark, through Barksdale, was of the opinion that it could obtain the desired loan through John Hancock for whom it was a contractual agent placing and collecting loans for it in various areas throughout the country. Clark never was an institutional investor itself, that is, a source of lending funds. Barksdale made a preliminary contact with John Hancock's representative and obtained an expression of interest in making the permanent loan desired by Southern, and then relayed this information to Fortier, who in turn wrote to Southern's president and manager, Wynn, on January 29, 1971 (Ex. P–2):

> "As you know, your entire package for mortgage processing is with our investor for the finalization and issuance within thirty (30) days, of a

"$6,500,000 construction and permanent first mortgage commitment on the captioned project . . . . "

Thereafter, on February 11, 1971, Fortier again wrote to Wynn (Ex. D–1) asking him to have defendant's executive committee members available to meet with Fortier on February 17, 1971 at a designated time "for finalization of papers for the permanent mortgage you require to complete the captioned project . . . . ". In this letter he further stated that "Our institutional investor has indicated that they will approve this mortgage on information you have previously supplied, that is, the feasibility report, MAI appraisal, etc.".

Pursuant to Fortier's request, Southern's Board of Directors met with Fortier and Barksdale. The directors were concerned and chagrined when they learned that Barksdale was representing another broker, Clark, rather than an institutional investor. However, Barksdale then assured them that he would probably be able to obtain a loan commitment in the desired amount from John Hancock, and the defendant verbally agreed to pay Clark a 1% brokerage fee if the loan commitment was obtained. Various information and documentation was furnished Barksdale by the defendant. Southern then advised its construction lender, IDS, that it hoped to obtain a John Hancock commitment which would be used in part to discharge its obligations. Clark, through Barksdale, contacted IDS and sought its indulgence and also contacted the top management of Hilton Inns, Inc., and induced it to intervene with the construction lender.

On February 19, 1971, the defendant's president and two of its directors met with Clark's representatives, including Barksdale, in Houston, Texas, in order to execute the loan application to John Hancock. Fortier of General did not attend this meeting. The executed application was then submitted to John Hancock.

On March 11, 1971, Wynn, the defendant's president, reported to a meeting of the Board of Director's that Clark had been engaged for the purpose of obtaining a $6,000,000 loan in order that construction on the defendant's Hilton Hotel in Jackson could be resumed and that John Hancock had tentatively approved the loan. John Hancock later declined to make the loan because it had discontinued financing hotel and motel construction projects.

In the meantime, Clark sought and obtained letters concerning the project from bank, municipal and state public officials in Jackson, and assisted the defendant in obtaining fee title to the leasehold portion of the construction site as desired by proposed lenders, obtained copies of the Hilton License Agreement, resumés of members of the defendant's Board of Directors, plans and specifications for construction of the project, copies of existing title insurance policies, appraisals, deeds of trust, plats, financial data on the defendant and its Board members, credit reports, feasibility studies and various other documents, including publications on the economic condition of the Jackson, Mississippi area. It also prepared a brochure concerning the proposed loan for submission to other lenders and submitted the loan request to numerous lenders throughout the United States. In view of the fact that the plaintiffs were unable to obtain a permanent loan commitment satisfactory to the defendant, they then discussed with and received the defendant's oral agreement to attempt to obtain a "stand-by commitment" for $6,000,000. A stand-by commitment is a short term commitment of usually one to four years containing very high fees to the borrower and is utilized to "take out" the construction lender, that is, it is more in the nature of a guaranty or surety contract to induce an interim lender to commit construction funds for the completion of a project in order to give time to obtain long term or permanent financing. Barksdale's stand-by commitment suggestion was

made after he was unsuccessful in obtaining an open end construction loan from FMI of Miami, Florida, a potential lender, whose two representatives had met in Jackson with him, Fortier and officials of the defendant.

On or about April 21, 1971 at a time when IDS was threatening immediate foreclosure, Barksdale contacted Saul, with whom he had previously transacted business and whose key personnel he knew, and discussed by telephone the requested commitment which was followed by a letter from Barksdale to Stephen Windsor of Saul on the same date (Ex. P–8). The letter stated that the defendant was requesting a two-year stand-by commitment in the amount of $6,037,500 which was exactly 75% of the MAI appraisal and informed Windsor that he (Barksdale) called the defendant and advised it of Saul's terms and conditions and that it was anxious to receive an application for the loan on the terms related to Barksdale by Windsor in their previous telephone conversation. Neither the defendant nor any of its officers, board members or stockholders had ever heard of or knew of the existence of Saul prior to the time that Clark suggested requesting the stand-by commitment. A mortgage loan application was then forwarded to Clark, which in turn sent it to the defendant for execution. This application was signed by Wynn for Southern on May 10, 1971 and forwarded to Saul (Ex. G–3). In the application Southern requested a $6,000,000 loan for a term of 60 months with interest at 13% per annum on the unpaid balance with principal and interest to be payable in the amount of $80,000 monthly based on a 16% annual constant.

Paragraph 13b of the application provides that as a consideration for a 24 month stand-by commitment the applicant agrees to pay the lender $240,000, the first payment of $120,000 to be due and payable upon issuance of the commitment and the second payment of $120,000 to become due on or before May 1, 1972, and further, that non-payment thereof will make the commitment null and void. Paragraph 13c states that "as an additional consideration for settlement of the standby loan, lender will be paid $120,000 by the borrower at closing". Although the next to last paragraph of the application provides that a good faith deposit of $120,000 in the form of a check is enclosed with the application, in lieu thereof, at the suggestion of Wynn, a $120,000 30-day irrevocable letter of credit from the First National Bank of Jackson, Mississippi dated May 11, 1971 in favor of Saul (Ex. D–5) accompanied the application and was referred to by an addendum attached thereto. This letter of credit inter alia provided that unless the construction loan for the amount of the commitment with a discount of 1% and 9¾% per annum was closed within thirty (30) days from the date of the letter, that the letter shall be void.

In the meantime Clark continued its efforts to obtain the forbearance of the construction lender, IDS, which withheld foreclosure because of the pendency of the Saul commitment, and the defendant requested and received an extension of the opening date required by its license agreement with Hilton Inns, Inc. On May 25, 1971, Saul sent a representative to Jackson to inspect the building site and project. On June 14 Saul requested of Barksdale an up-dated financial statement for certain of the proposed guarantors named in Paragraph 13h of the application.

The 30-day letter of credit of First National Bank was extended several times and was ultimately modified and made acceptable to Saul prior to its hereinafter discussed $4,050,000 commitment.

By letter of June 25, 1971 addressed to the defendant and receipted for by its president on June 28, 1971, with a copy to Clark (Ex. G–4), Saul issued its stand-by loan for $6,000,000 in exact accordance with the defendant's application of May 10, 1971. In this letter

the fee for the commitment, in accordance with the application, was stated to be $240,000 payable as follows: the first payment of $50,000 due and payable on issuance of the commitment; the second payment of $70,000 due and payable on July 15, 1971; and the third payment of $120,000 due on June 25, 1972. It was provided that in the event the fee was not paid the commitment would become null and void, and that the $120,000 irrevocable letter of credit which had accompanied the application would be held until receipt of the total first year fee. The letter further states that it, along with the application, formed the entire commitment. Clark promptly invoiced the plaintiff for 1% of the stand-by loan commitment, or $60,000 but has never been paid.

The defendant failed to promptly pay to Saul the $120,000 first year fee called for by the commitment and on July 20, 1971 IDS's attorneys demanded immediate financial information and a payoff by July 31. On July 23 Saul accepted an extension of the letter of credit for payment of the fees and made copies of the commitment available to the First National Bank which was considering participating for $3,000,000 in a construction loan based on the Saul commitment. In the meantime, with the defendant's knowledge and consent, Clark continued its efforts to obtain a construction lender based on the Saul commitment, contacting numerous potential lenders, including IDS. Much confusion had arisen as to whether the stand-by commitment application to Saul, when accepted, required Saul to participate in a construction loan in view of the following answer to the following question at the bottom of the first page of the application: "For what purpose is this loan wanted? To provide a portion of construction costs." Apparently Barksdale was of the opinion that Saul was to participate in the construction loan because in his May 11, 1971 letter to IDS (Ex. D–7), he referred to Saul's requirements of participation in the loan together with the bank.

On July 13 Saul wrote Barksdale notifying him that the bank's letter of credit ws unsatisfactory and that provisions a, b and c would have to be deleted (Ex. D–15). On July 14 Barksdale notified Wynn by letter (Ex. D–16) that Saul interpreted the above provisions to obligate it to participate in the construction financing "which we know is not currently their intent".

On August 9, 1971 Barksdale wrote to Wayne L. Nix, senior vice president in charge of the legal department of the First National Bank of Jackson, stating that "the Saul commitment indicated two basic requirements which must be met for the take out to be unequivocal, first that the building must be built in accordance with plans and specifications and second, that the building must be licensed by a Hilton franchise", and further that it is important that Saul receive its fee in order that the commitment could go into full force and effect and not be cancelled thereby ending the necessity of a construction loan (Ex. P–28).

On September 7, Barksdale, who had left Clark and formed his own company, wrote Windsor of Saul outlining the cost estimate of the Jackson Hilton as related to him by Wayne Nix of the Bank:

" . . . . It would seem that basically these developers will not be able to meet the equity requirement and that this deal will probably die.

" . . . . We are closing our file on this matter and suggest that everyone else do likewise.

"If there is any opportunity to reopen this case in the future, we would like to reserve the opportunity to represent it provided there are no missing pieces outstanding." (Ex. D–19)

On the next day IDS directed its attorneys to commence foreclosure proceedings against the defendant's project (Ex. P–66).

In the interim in April 1971, the defendant had asked General to return its

$3,000.00 good faith deposit made pursuant to Paragraph 14b of the second part of its written agreement (Ex. G–1). This request was refused by General because the defendant refused to discuss payment of any fee to General. On June 14 Barksdale had written Southern's president, Wynn (Ex. D–9), informing him that Clark had been introduced to the Jackson Hilton proposition by Fortier, General's president, and since Saul had been for approval on the take out for the Jackson Hilton, that Barksdale presumed that arrangements would be made to "take care of Jacques Fortier as previously stated by you and Judge Moore". Barksdale further related that he did not wish to get into a commission squabble between Fortier and the defendant, but that Clark's fee for services in arranging the Saul stand-by commitment will be $60,-000 and that any agreement that the defendant had with Fortier was strictly between defendant and Fortier; however, he advised Wynn that unless he heard from Fortier that he was satisfied with whatever settlement was agreed upon, that it could seriously affect the outcome of the funding of the stand-by commitment. Neither Fortier nor anyone else on behalf of General ever invoiced the defendant at any time for its claimed brokerage fee, although Fortier testified that General did not intend to forego its claim fee even if the Saul commitment was not funded. On July 19, 1971 Fortier wrote to the defendant stating that Barksdale was greatly upset when advised that General's fee "had not been settled" (Ex. P–12).

On September 27 Saul wrote Southern stating that pursuant to a telephone conversation of that date with a Mr. Rush (who was a major stockholder of the defendant and a person of substantial financial means):

"  .   .   .   .   we are agreeable to *amending* our letter of June 25, 1971 addressed to and acknowledged by you as follows: (emphasis supplied)   .

1.  B. F. Saul Real Estate Investment Trust to receive $50,000 in cash prior to September 30, 1971. The second payment of $70,000 shall be payable December 14, 1971. The third payment of $120,000 will be due on January 15, 1973."

This letter also stated that it was understood that a number of rooms planned in the building would be reduced which would in turn cause reduction of the total loan commitment: No specific loan amount was committed at that time. The defendant then paid Saul the $50,000 fee due in September.

On October 11 Southern placed Fred Bayles and Leroy Roell in charge of management of its Hilton project and its executive committee authorized execution of a $50,000 note by the defendant in their favor to evidence $50,000 which they had advanced on behalf of the defendant to B. F. Saul in payment of the above fee, and further authorized the issuance of 1,000,000 shares of Southern's capital stock in exchange for their securing a contractor, architect and interim financing to construct the Jackson Hilton. Clark sought to be kept advised on the progress of the funding of the project but neither Clark nor General was informed of the above requests for extension or amendment or the grant thereof or of the other various events that were taking place. In October Barksdale learned from a third party that Southern had not been foreclosed and that it appeared that Saul would issue a stand-by commitment. He contacted Southern's president, Wynn, who told him "not to worry—that his brokerage fee would be honored", at which time Barksdale offered assistance to Wynn which was declined. By that time, through the efforts of Roell and Bayles, a bondable contractor had been procured, final plans and specifications had been prepared for a 225-room rather than a 350-room hotel, and $50,000 had been sent to Saul in partial satisfaction of its fee requirement.

On November 4 IDS advised Bayles and Roell that it would continue to withhold foreclosure provided certain requirements were met, including the receipt from Saul of a commitment in an amount sufficient to cover the cost of the completion of the building as well as a letter from Saul indicating approval of the final plans and specifications on the revised Jackson Hilton prior to the resumption of construction (Ex. P-59).

On November 6 the defendant, acting through Bayles, forwarded to Saul preliminary plans and cost estimates on the project redesigned to 250 rooms and requesting consideration of reducing the amount of the loan from $6,000,000 to $5,000,000 (Ex. P-38). Another follow-up letter was written by Bayles to Saul which in part states:

"In accordance with our conversation, Southern Business is making a request to charge your commitment as follows:

Reduce the amount of the commitment to $4,050,000.

The second payment of $31,000 due and payable on January 15, 1972.

Request that Item 13h (Special Provisions) be deleted."

Saul replied by a letter dated December 17, 1971 (Ex. G-5) stating, "We are agreeable to amending your Stand-by Loan Application dated May 10, 1971 and our commitment letter dated June 25, 1971 as follows . . . ." and further approving the substitution of Bayles and Rush for Moore, Saunders, Smith and Blossman and their wives as guarantors, thus changing the "special provisions requirement" of Paragraph 13h as previously requested by the defendant. The letter further provided that all other terms and conditions of the application and the letters referred to would remain the same.

On December 27 IDS wrote to Bayles and Roell agreeing to be the construction lender for the completion of the project (Ex. P-6) and thus funded the reduced stand-by commitment of Saul which continued to require that the building be constructed in accordance with approved plans and specifications and that the franchise agreement with Hilton Inns, Inc., be in full force and effect as prerequisites to closing the loan, as was required in the original application for and the granting of the previous $6,000,000 stand-by commitment.

On January 13, 1972, the defendant executed its note payable to IDS for construction funds in the amount of $4,050,000 (Ex. P-64), and on January 13, 1972 Clark filed in the public records in the Chancery Clerk's office of Hinds County, Mississippi, a document entitled "Lien Affidavit and Claim" (Ex. D-22). This sworn document recites in part that labor and/or services were furnished to the defendant pursuant to an oral agreement and that Clark claimed $40,500 for securing mortgage financing in the amount of $4,050,000 for the purpose of developing and improving the described property in question. On February 2 Clark wrote Barksdale, who was then in business for himself, giving him authority to release the above lien which was filed against the land and improvements thereon in exchange for a cashier's check made payable to Clark in the amount of $40,500 (Ex. D-23). Although Fortier knew that Clark was going to file this lien, neither he nor anyone else on behalf of General has ever filed a lien against the project. His excuse for not doing so was that he felt that his filing would not stop construction of the reduced sized motel.

## LAW

This Court has jurisdiction of this controversy by virtue of the diversity of citizenship of the parties and therefore, Mississippi's substantive law controls.

The rights and liabilities of the parties hereto in this brokerage fee dispute are analogous to and governed by the same rules of law which apply to real estate brokerage questions. The Mississippi

Supreme Court in *Partee v. People,* 197 Miss. 486, 20 So.2d 73, 78 (1944) stated the rules which determine whether a real estate agent is entitled to recover a commission:

1. Where the contract between the owner of the property and the agent specifies the price and the terms of sale, the agent performs his duty, and is entitled to his commission, when he procures a purchaser ready, willing and able to buy, even though the owner may then decline to sell.

2. Where property is placed in the hands of a real-estate agent for sale at a certain price, and on specified terms, and a sale is brought about through the efforts of the agent as the procuring cause, he is entitled to his commissions on the sale, even though the final negotiations were conducted through the owner, who, in order to make the sale, accepts a price less than that stipulated to the agent, or when he sells at the price which the agent was authorized to make the sale.

3. Where the contract expressly makes the payment of a commission depend on the obtaining of a certain price for the property and the making of the sale on specified terms, the agent cannot recover, even though the owner sells at a lesser price, or on less favorable terms to a person whom the agent produced as a prospective purchaser, unless the agent is prevented from making a sale by the fault of the owner—an exception to the two general rules above stated.

See also *Case v. Harrison,* 192 Miss. 531, 6 So.2d 582, 587 (1942).

■ The formation of a brokerage contract need not be in writing, but can in fact be based on words, acts and outward expressions of the parties, *Hill v. Capps,* 248 Miss. 601, 160 So.2d 186 (1964), and even though a contract expires under its own terms, it neverthe-less can be extended by the agent's actions and the principal's acquiescence. *Partee v. Pepple, supra; Smith v. London Stetelman & Kirkwood,* 185 So.2d 150 (Miss.1966).

■ Applying the foregoing rules of law to the facts of this case, this Court concludes that the plaintiff, General Mortgage Securities Corporation, is not entitled to recover a brokerage fee from the defendant either on a contractural or a quantum meruit basis. In the only contract entered into between General and Southern, which was the two part written agreement (Ex. G–1), the amount of the loan which General agreed to and was authorized by Southern to procure for it was specified at $6,500,000 for a period of ten years with interest of not more than 9.5% per annum and a constant payment of 10.50%. This contract was effective for a period of at least 30 days from the date thereof or from the date on which all the necessary documents called for in Paragraph 4 of the first part thereof were furnished to a lender upon its request and was effective thereafter until cancelled by Southern. This contemplated loan was one that Fortier, as president of and acting for General, attempted to procure from John Hancock. This contract did not expire by its own terms nor was it ever effectively terminated by Southern's April 1971 oral request of General for a refund of the $3,000 good faith deposit posted pursuant to Paragraph 14b of the second part thereof because that paragraph specifically provided that in the event the desired loan commitment was not delivered within 30 days, the deposit would be refunded. Thus, the demand for refund, which was refused by General, did not affect the effective period of the written brokerage fee contract provided for in Paragraph 4. Although the law permits any principal to revoke or terminate a brokerage fee contract at any time for any reason, if it is not supported by consideration, nevertheless, the broker must be notified of such revocation. See

*Baird v. Lewis*, 229 Miss. 61, 90 So.2d 184 (1956). The requested refund did not expressly or impliedly terminate the contract. There was no express termination thereof as acknowledged by the testimony of Judge Russell Moore a director and stockholder of the defendant corporation, who acknowledged that although he had asked Southern's president, Wynn, to terminate the contract that he was unable to find any evidence in the defendant's files or records that he or anyone else had done so for the defendants. However, General did not secure a commitment in the above amount on the above terms from John Hancock or anyone else for interim and permanent financing, and there was never any agreed written or verbal modification of the brokerage contract, and thus General did not perform in accordance therewith and is not entitled to any brokerage fee based thereon. It is evident that throughout the entire period of time in question and particularly subsequent to the initial meeting in Jackson between Fortier, Barksdale and Southern's representatives it was no longer dealing with General and did not consider itself to owe General any brokerage fee but dealt thereafter exclusively with Clark through Barksdale. At no time did the defendant enter into a contract, written or oral, with General to procure for it a stand-by loan commitment, and the fact that it authorized Barksdale of Clark, who was introduced to the project by Fortier of General in an effort to obtain assistance in obtaining the permanent and interim commitment provided for in the written contract between General and Southern, does not entitle General to collect a brokerage fee on the Saul stand-by commitment. The correspondence between them establishes that Barksdale was dealing with Southern solely on behalf of Clark and not General, and this is evidenced by his June 14, 1971 letter to the defendant (Ex. D–9) wherein he stated "Our fee for our services in arranging this commitment will be $60,000. Any agreement that you have with Jacques (Fortier) is strictly between your firm and him". Furthermore, Southern's March 20, 1971 corporate minutes reflect that Barksdale was employed to negotiate a $6,000,000 loan. If he had been employed under General's contract, there would have been no reason to enter into a separate agreement for compensation. General never did obtain any authority from the defendant to obtain for it a stand-by loan commitment and therefore is not entitled to collect any brokerage fee on the $6,000,000 Saul commitment.

In summary, General is not entitled to recover any brokerage fee from the defendant, and the defendant is entitled to a judgment dismissing General's claim against it at General's cost.

If Clark is entitled to recover from the defendant, it must be on the basis of its having been the procuring cause of a fundable stand-by loan commitment from Saul. As previously noted, after Clark and General were unable to obtain permanent or interim financing for Southern pursuant to the January 22, 1971 written contract, the defendant verbally authorized Barksdale, at his suggestion, to attempt to obtain a fundable stand-by commitment for $6,000,000 and agreed to pay Clark a 1% brokerage fee therefor. Clark, through Barksdale, then contacted Saul, with whom he had previously done business and many of whose officers he personally knew, seeking the desired commitment. No one connected with the defendant had ever been in contact with or knew of the existence of Saul up until that time. A mortgage loan application was prepared by Saul and sent to Barksdale who in turn delivered it to the defendant whose president executed it and returned it to Saul. In its letter of June 25, 1971 Saul approved the $6,000,000 stand-by loan commitment application of May 10, 1971, specified the amount and dates of the payments of its commitment fee in accordance with the application and agreed to hold the irrevocable letter of credit issued by the First National Bank in the amount of

$120,000 in lieu of the $120,000 cash fee required in the application until receipt of the total fee due on the first year's commitment. Saul further stated that its letter along with the application formed the entire commitment.

The defendant contends that the Saul commitment was not capable of being funded by a construction lender because it was subject to the following contingencies: (1) Saul's approval of the final plans and specifications which at that time were allegedly non-existent; (2) Saul ,contended that it was not required to make or participate in the construction loan with the First National Bank which had issued a letter of credit stating that it was so required; (3) The hotel would have to be guaranteed a Hilton franchise if constructed. Also, the defendant contends that the commitment never became binding inasmuch as it never paid the requirement fee to Saul. These contentions are without merit inasmuch as plans and specifications had been furnished Saul by Barksdale, and it was agreed and understood by everyone this would be a Hilton franchised hotel and Barksdale had had Hilton parent company intercede with IDS requesting that it refrain from foreclosing against the defendant. The fact that the agreed fee provided for in the application submitted to Saul by Southern was not paid certainly was not the fault of Clark but of the defendant, and therefore, under the above stated law, this non-payment does not defeat Clark's right to receive its 1% brokerage fee on the $6,000,000 stand-by commitment, that is $60,000.

Another fact that leads this Court to the conclusion that this was a firm, fundable and bankable commitment is the fact that when it was subsequently amended by Saul at the request of the defendant, without Clark's knowledge, to reduce it to $4,050,000, change the hotel from 375 rooms to 250 rooms and to change the names of the guarantors contained in Paragraph 13h of the application, it was then funded for the reduced amount by IDS as construction lender, completed and is now in business.

A stand-by commitment issued by Saul on June 25, 1971 was the major, if not the only, reason for IDS withholding foreclosure of its previous construction loan to the defendant.

In view of this Court's conclusion that the plaintiff, Clark, is entitled to recover $60,000 as its 1% brokerage fee on the $6,000,000 stand-by commitment issued by Saul, it is not necessary to determine whether Clark subsequently abandoned his employment by writing to Saul on September 7, 1971, one day before the project was put in the hands of IDS's attorneys for foreclosure, stating that because the defendants apparently would not be able to meet the equity requirement, the deal would probably die, expressing his appreciation for Saul's efforts and patience, representing that it had done everything in its power to make a profitable deal out of the project for all concerned, that it was closing its file on the matter and suggesting that everyone else do likewise (Ex. D–19). The letter went on to state however that "if there is any opportunity to reopen this case in the future, we would like to reserve the opportunity to represent it provided there are no missing pieces outstanding". This Court is of the opinion that this did not constitute an abandonment on the part of Clark and was not any admission on its part that it was not entitled to a commission since it had procured a firm, fundable or bankable stand-by commitment which was not funded in the amount of $6,000,000 solely because of the non-payment of the agreed fee by the defendant.

The above determination also makes it unnecessary to decide whether Clark is entitled to be remunerated on a quantum meruit theory or whether the $4,050,000 stand-by commitment was a new commitment or merely an amendment of the original $6,000,000 commitment. However, so that the parties and the Appellate Court, in the

event of an appeal, will have the benefit of this Court's determination of this question also, it is very evident from the correspondence between Saul and Fred M. Bayles, then chairman of the defendant's Board of Directors (Exs. P.–38–40, G–5) that the $4,050,000 standby commitment was merely an amendment of the June 25, 1971 commitment in accordance with the request of the defendant. The December 17, 1971 $4,050,000 commitment (Ex. G–5) reads in part:

" . . . . we are agreeable to amending your Stand-by Loan Application dated May 10, 1971 and our commitment dated June 25, 1971 as follows:

1. The loan amount is to be reduced to $4,050,000 from $6,000,000 . . . .

\* \* \* \* \* \*

All of the terms and conditions of your application and above referenced letters will remain the same."

Thus if Clark were not entitled to recover its 1% fee on the original commitment, it would be entitled to recover it on the amended commitment, but certainly it is not, as contended by it, entitled to recover the brokerage fee on both amounts any more than a real estate agent would be entitled to recover an agreed commission on both the purchase price of property listed with him and on a reduced amount at which the owner actually sold it to the purchaser procured by the agent. The defendant also contends that Clark is estopped from claiming the $60,000 brokerage fee commission because on January 13, 1972 it filed a sworn lien notice in the court records of Hinds County, Mississippi, in which it stated that its claim against the defendant was in the amount of $40,500. *Standard Oil Company v. Crane*, 199 Miss. 69, 23 So. 2d 297, 301 (1945); *Logan v. Smith*, 229 Miss. 513, 91 So.2d 707, 708 (1956).

The above cases relied upon by the defendant enunciate the well established principle of judicial estoppel which prevents a party to a judicial proceeding from denying or contradicting sworn statements made therein. The affidavit in question was not made during the course of a judicial proceeding, and thus Clark is not judicially estopped from now claiming that the defendant owes it $60,000 rather than the $40,500 stated in its lien notice. The above notice was filed hurriedly under the exigency of an imminent threatened foreclosure by IDS, and it is not a bar to nor does it prevent Clark's recovery of $60,000 herein together with its costs against the defendant.

■ The defendant further contends that plaintiffs may not maintain their suit in this Court because they transacted business in the State of Mississippi without procuring a certificate of authority to do so from the Secretary of State, in violation of Sec. 79–3–211, Mississippi Code of 1972. This Court finds that the punitive sanction of Sec. 79–3–247, Mississippi Code of 1972, may not be invoked by the defendant inasmuch as the transactions involved herein clearly fall within the exception or exclusion found in Paragraph (e) of 79–3–211, which excludes therefrom the transacting of any business in interstate commerce. *Humboldt Foods Inc. v. Massey*, 297 F.Supp. 236 (N.D.Miss.1968); *Ross Construction Co. v. U. M. & M. Credit Corp.*, 214 So.2d 822 (Miss.1968); *Morrison v. Guaranty Mortgage & Trust Co.*, 191 Miss. 207, 199 So. 110 (1940); *C.I. T. Corporation v. Stuart*, 185 Miss. 140, 187 So. 204 (1939). See also *Mid Continent Telephone Corp. v. Home Telephone Co.*, 307 F.Supp. 1014 (N.D.Miss. 1969), *Cone Mills Corp. v. Hurdle*, 369 F.Supp. 426 (N.D.Miss.1974).

A Judgment conforming with the foregoing findings of fact and conclusions of law approved as to form by counsel for all parties, shall be presented to this Court in Biloxi, Mississippi in the manner and within the time prescribed.