419 So.2d 184 (1982)
Carol Lee SMITH and Mississippi Land and Real Estate Co.
v.
Billy R. SULLIVAN and Louise Sullivan and the Mississippi Real Estate Commission.
No. 53392.
Supreme Court of Mississippi.
September 1, 1982.
*185 Abe A. Rotwein, Jackson, for appellants.
Cupit & Maxey, Glenda W. Tomlinson, Jackson, for appellees.
Before SUGG, P.J., and HAWKINS and PRATHER, JJ.
PRATHER, Justice, for the Court:
The Mississippi Real Estate Commission held a hearing as a result of complaints filed by the Sullivans against their real estate broker, C.L. Smith. The Commission concluded that Smith had acted for more than one party in a transaction without the knowledge of all parties for whom he acted and that he was also guilty of improper dealing. As a result of this determination, the Commission exercised its statutory power to revoke Smith's license to act as a real estate broker. Smith appeals from the decision of the Commission and its affirmance by the Circuit Court of the First Judicial District of Hinds County. We affirm.

I.
The Sullivans were owners of 220 acres of undeveloped land in Simpson County. Jackson Production Credit Association [hereinafter referred to as JPCA] held a mortgage security interest in 212 1/2 acres of the land, and the Sullivans were delinquent in the payments owed to JPCA. The Sullivans held 7 1/2 acres of the land free and clear of the debt.
Since the Sullivans owed in excess of $50,000 to JPCA, which was planning to foreclose soon, they sought out Smith to list for sale 112 1/2 acres of the land at $500 an acre, but reserving their mineral rights in themselves. The parties signed a listing on March 22, 1978 whereby Smith, a first cousin of Mr. Sullivan, was given a three month exclusive right to sell the land for the Sullivans until June 22, 1978 at a commission of 10 percent of sales price. If sold under the terms of the listing, the Sullivans would be able to satisfy the debt owed to JPCA and also retain 107 1/2 acres of land and the minerals under all acreage.
Employees of Smith's real estate company testified that the company ran regular ads in several local newspapers in an effort to sell the land. R.C. Thomas, a licensed real estate salesman with one of Smith's companies, added that there were only two offers to purchase the property. Thomas also claimed that the land could not sell for more than $350.00 an acre. In August, after expiration of the listing, Smith found a prospective purchaser by the name of K.R. Brown.
The Sullivans inquired of Smith as to the financial background of Brown, and Smith responded that Brown was a man who was financially sound and owned a real estate development at Harrisville in Simpson County. The Sullivans agreed to have Smith negotiate with Brown. Brown offered to purchase the 112 1/2 acres that were originally listed, but additionally required the 7 1/2 acres of unmortgaged land, plus the mineral rights to all 120 acres. The time for foreclosure was drawing near and Smith persuaded the Sullivans, although regretfully, to agree to those terms. An option to purchase the land with all minerals for $54,000.00 ($450.00 an acre) was thereby granted to Brown on September 1, 1978 and was to expire on November 1, 1978.
The Sullivans told Smith that the $54,000.00 purchase price would not pay for both the mortgage debt and his 10 percent sales commission. Smith said he would forego the commission, since he believed that he could make a commission later by selling the land for Brown.
*186 Before Brown exercised the option, Smith obtained and paid for bulldozer and survey work on the land. This was done without the consent of the Sullivans. On September 13, the Sullivans were contacted by one J. Miller, a man who sought to lease the mineral rights on the land. Miller wanted to lease both the Sullivans and Brown's optioned property together at $50.00 an acre and would not negotiate for less that the total. This would have given the Sullivans an additional $5,200.00 for their minerals.
The Sullivans decided that they needed to talk with Brown about working out the mineral leasing prospects with Miller, but Smith refused to arrange such a meeting or to give them Brown's phone number. Smith claimed that Brown had a sick child and did not want to be bothered. The Sullivans persisted in their attempts to locate Brown, and contacted the Secretary of State's office, and people in the Harrisville area, and the Better Business Bureau, among others. They finally learned that K.R. Brown was a woman who did not own any real estate in Harrisville but who had been employed on several occasions by Smith to do interior decorating. Additionally, the Sullivans also learned that Smith had cosigned a loan application to purchase the land at JPCA with Kay R. Brown. Incidentally, Smith owned a corporation named World Petroleum Limited, and engaged in business of buying and developing petroleum interests.
In light of these circumstances, Mrs. Sullivan contacted JPCA and requested that they decline to grant a loan to Brown. Woody Toler, an assistant vice president and loan officer at JPCA testified that the loan was thereafter not acted upon due to the fear of litigation. Toler also introduced into evidence a deed of trust on the land which was signed by both Smith and Brown. However, the title binder indicated that the land was to be conveyed solely to Brown. Toler further claimed that upon making the application, Smith told him not to tell the Sullivans about the loan application. When Smith was questioned about this matter, he admitted that he made such a statement to Toler but denied that he was involved in the purchase of the land. He explained that he requested Toler not to tell the Sullivans about the application because he did not want them to get the wrong impression.
When Kaye Brown testified, she stated that Smith was her agent for the purpose of buying the land. Furthermore, Smith admitted that he advised Brown in these matters. Brown claimed that Smith cosigned her loan application because she was recently divorced and had no credit. She allegedly intended to repay Smith for the bulldozing and surveying, and she added that Smith was to have no title to the land.
Several lawsuits ensued. The Sullivans refused to sell the property. Thus, Brown filed a suit for specific performance to enforce the option to purchase. Smith then wrote the Sullivans and requested that they pay him a commission for the sale of the land to Brown. When they refused to pay, Smith sued for his commission in the circuit court. Meanwhile, the Sullivans contacted one Conrad Martin, a real estate broker. He talked with the Sullivans in July of 1979 about selling their land if the litigation resulted in the Sullivans' favor. He was able to find a tentative purchaser who was willing to pay $650.00 an acre, and who agreed to take only 1/4 of the mineral rights. On the basis of this evidence, the Commission concluded that the aforementioned conduct of Smith constituted violations of section 73-35-21(a) and (m) of the Mississippi Code Annotated (1972) which prohibited: (1) acting for more than one party in a transaction without the knowledge of all parties and (2) improper dealing. The Commission thereby ordered the revocation of licenses held by both Smith and his company, Mississippi Land and Real Estate. That ruling was affirmed by the Circuit Court of the First Judicial District of Hinds County on July 20, 1981.

II.
Sections 73-35-1 through 73-35-37 of the Mississippi Code Annotated (1972 & Supp. *187 1981) provide for the licensing and regulation of real estate brokers and salesmen. Most jurisdictions have similar statutory schemes, and these statutes are designed to protect the public from incompetent or dishonest real estate professionals. See 12 Am.Jur.2d Brokers § 19 (1964) (revocation or suspension of license); Annot., 68 A.L.R.3rd 530, 532 (1957) (background and general principles of regulatory statutes). Under our statutory framework, for example, section 73-35-7 permits licenses to be granted only to persons who are trustworthy and competent to transact real estate business in such a manner as to safeguard the interests of the public. Furthermore, to be granted a license, the broker or salesman must have recommendations by three citizens certifying that he has a good reputation for honesty and trustworthiness. Mississippi Code Annotated § 73-35-9 (1972).
In order that these high standards be maintained, the Mississippi Real Estate Commission has been empowered to conduct hearings for the refusal, suspension or revocation of licenses for various grounds. Miss. Code Ann. § 73-35-21 (1972). Thus, a broker or salesman may be denied the privilege to conduct such business for various acts such as where (1) he has acted for more than one party in a transaction without the knowledge of all parties for whom he acts; or where (2) his conduct constitutes bad faith, untrustworthiness, or dishonest and improper dealings. Id. The prohibition of such acts follows the long established recognition that a broker holds a fiduciary relationship with its attendant duties to his principal. A broker authorized to sell his principal's realty has a fiduciary relationship requiring full disclosure, frankness and honesty in his dealings with the principal. Blanks v. Sadka, 241 Miss. 821, 133 So.2d 291 (1961); VanZandt v. VanZandt, 227 Miss. 528, 86 So.2d 466 (1956). Moreover, he must not put himself in a position antagonistic to the principal's interest by fraud or by representing others with interests adverse to his principal's interests. Randal Craft Realty Co., Inc. v. Unijax, Inc., 653 F.2d 1066 (5th Cir.1981); Roy Realty Co. v. Burkhardt, 146 Miss. 270, 111 So. 289 (1927). See also Restatement (Second) of Agency, §§ 376-398 (1958) (enumeration of duties that agents owe their principals). In other words, a broker is subject to a duty to act solely for the benefit of the principal in all matters connected with the agency. Id. at § 387.

III.
The two dominant issues involved here are (1) whether Smith was still in a broker-fiduciary relationship after the expiration of the listing; and (2) whether the evidence was sufficient to prove violations of section 73-35-21.
With regard to the first issue, it is generally said that if the authority or agency is conferred for a specific time, it expires upon the completion of that period. 3 Am.Jur.2d Agency section 35 (1962); Restatement (Second) of Agency § 105 (1958). Upon termination of that agency, a broker can deal with his former principal as freely as with any third person so long as he ceases to have confidential relations with him. W. Seavey, Handbook of the Law of Agency 250 (1964). However, under Mississippi law, a contract which has expired under its own terms may be extended by a broker's actions and the principal's acquiescence. Ivor B. Clark Co. of Texas, Inc. v. Southern Business & Industrial Development Co., 399 F. Supp. 825 (S.D.Miss. 1974); Smith v. London, Stetelman & Kirkwood, Inc., 185 So.2d 150 (Miss. 1966); Partee v. Pepple, 197 Miss. 486, 20 So.2d 73 (1945). In the instant case, Smith obviously viewed himself as the Sullivans' agent after expiration of the listing since he charged them a commission and filed suit on those grounds. Furthermore, conversations between Smith and the Sullivans indicated that an implied or oral contract still existed. We therefore conclude that Smith was a broker-agent of the Sullivans throughout the time period in question and consequently owed fiduciary duties to the Sullivans.
With regard to the second issue concerning the adequacy of the evidence, an appellate court has power to review any *188 order made by an administrative commission to determine whether it is supported by substantial evidence or whether it is purely arbitrary and capricious. Mississippi Ins. Comm. v. Savery, 204 So.2d 278 (Miss. 1967); Dixie Greyhound Lines, Inc. v. Miss. Pub. Serv. Comm., 190 Miss. 704, 200 So. 579 (1941). In this case, several witnesses testified that Smith attempted to deceive the Sullivans as to the identity of Brown and his co-signing of a loan. Furthermore, both Smith and Brown stated that Smith "advised" Brown. In other words, he was acting as the agent of both the Sullivans and Brown. In addition, the evidence also suggests that Smith himself had an interest in the purchase of the land. We therefore conclude that there was substantial evidence showing violations of section 73-35-21.

IV.
One last issue must be considered. The appellant, for the first time on appeal, contended that one of the commissioners on the Mississippi Real Estate Commission recused himself after the first hearing day, but continued to participate in the hearing after doing so, thereby denying him a fair trial. He did not vote in the decision, nor was the reason for the recusal stated in the record. This Court cannot say that this participation was prejudicial to or against the appellant since the personal reason for recusal was not stated in the record.
It is highly improper for a hearing officer to continue to participate in any hearing once he has recused himself, and the procedure to follow should be that he completely absents himself from the hearing and avoids contact with the other hearing officers. However, this Court has held that a party desiring to suggest disqualification of a judge must do so before the trial of a case or as soon as counsel learns of facts calling for a disqualification. City of Biloxi v. Cauley, 332 So.2d 749 (Miss. 1976); Dixon v. Rowland, 143 Miss. 270, 108 So. 807 (1926). Since the appellant failed to timely object to the commissioner's participation, this issue may not be considered now on appeal.
AFFIRMED.
PATTERSON, C.J., SUGG and WALKER, P. JJ., and BROOM, ROY NOBLE LEE, HAWKINS, BOWLING and DAN M. LEE, JJ., concur.