KIMBROUGH *v.* SMITH.

(In Banc.   Jan. 27, 1947.)

[28 So. (2d) 850.   No. 36254.]

Howie, Howie & McGowan, of Jackson, for appellant.

Will S. Wells, of Jackson, for appellee.

**Roberds, J.,** delivered the opinion of the Court.

The question presented on this appeal is whether the county Judge, who sat as judge and jury, had sufficient evidence before him to find and conclude that Smith impliedly agreed to pay Kimbrough a real-estate commission. He did so conclude and entered judgment for Kimbrough for $337.50. The Circuit Judge, on appeal to that court, on a review of the record from the County Court, reversed it, and entered a judgment for Smith, from which Kimbrough appeals here.

A decision of the foregoing question makes it necessary that we review the evidence.

Kimbrough had effected a sale of real property from Leo Daniels to E. D. Shaw, and Daniels needed a home to which to move. The three parties were in the office of Kimbrough in Jackson, Mississippi. Shaw mentioned the possibility that Smith desired to sell his farm, located a short distance from the corporate limits of Jackson. Kimbrough asked Shaw to call Smith. Shaw did so, Mrs. Smith answering the telephone, Mr. Smith not being at home. Mrs. Smith told Shaw that they had not sold their

property, and it was yet on the market. Shaw replied that he had a friend (not giving his name) who might be interested in buying, and he would possibly be out to see it later that afternoon. Shaw told Daniels and Kimbrough what was said. Later, according to Kimbrough, he called Mrs. Smith, told her his name and business, asked if it was correct that the property was for sale; she said, "Yes," it was for sale, and Kimbrough stated he understood the price was six thousand dollars, to which she assented. Kimbrough then inquired, if he brought a buyer would they pay him a commission; and Mrs. Smith replied, "Mr. Smith is not here, but you bring a buyer and we can get together," and he, Kimbrough, responded that the matter of Smith's paying a commission could be worked out later. Mrs. Smtih testified she had the telephone conversation with Shaw, and also with Kimbrough; she testified Kimbrough said, "I don't know whether Mr. Shaw told you or not, I am a real-estate man, if I bring a buyer out there will he (Smith) pay a commission?" and that she replied he would not, because she had heard Smith say he would not pay a real-estate commission, and that Kimbrough replied, "What about bringing him out anyway? Mr. Smith is a mighty fine fellow, we can work it out."

Kimbrough, Daniels and M. H. Giardina, who was employed in Kimbrough's office, went to the Smith home about three o'clock that afternoon, August 6, 1944. Mr. Smith was not at home. When they arrived all the parties were introduced to Mrs. Smith, and she understood Kimbrough was a real-estate dealer, and that Daniels was the prospective purchaser. After the three had inspected the farm Mrs. Smith told them Mr. Smith would be home about six o'clock that afternoon, and they agreed to return around seven o'clock. Mr. and Mrs. Daniels and Kimbrough did return about seven-thirty. They made some further inspection of the farm, and then, according to Kimbrough, he suggested that the matter of price and finances be discussed. Smith informed them the price

was then $6,750. Kimbrough and Daniels were surprised, having theretofore thought the price was $6,000. Terms of payment were discussed and Kimbrough testified that he then told Smith it was customary for the purchaser to pay for obtaining the loan; and for the seller to pay for having the deed prepared, the certificate of title, the revenue stamps on the deed, and the real-estate commission of five per cent. Daniels, who was acquainted with Smith, and who appears to have been entirely disinterested as between the parties, suported Kimbrough's testimony, although Smith said the matter of real-estate commission was not then mentioned, but was mentioned for the first time at his last interview with Kimbrough, as shown hereinafter. Kimbrough told Smith they would see him later, and he went with Mr. and Mrs. Daniels to their home, where the mater was further discussed between them. There was an existing mortgage against the Smith property of approximately $2,500. In the discussion between the parties it had been suggested that Daniels might increase that loan to $3,000, with which the existing debt could be paid, leaving about $500 to be paid Smith out of that loan; that Daniels pay $2,500 cash, which, added to the $500 to be paid Smith out of the loan, would aggregate a cash payment to Smith of $3,000, and, in addition, Daniels would execute to Smith a second deed of trust on the property for the sum of $1,250, payable $20 per month. Kimbrough prepared a contract of sale and purchase on these terms, and procured the signatures of Mr. and Mrs. Daniels thereto. Daniels and Kimbrough then returned to the home of Smith about ten o'clock of the same night, and Kimbrough informed Smith of the contract which had been signed by Mr. and Mrs. Daniels. Smith replied, ''I think you have bought a farm,'' but added, ''You are taking me a little too fast,'' and then said he would meet Daniels in Kimbrough's office the next morning. He did that, and there was a further discussion of the amount of cash Daniels could pay, independent of the loan, Smith apparently wanting

Daniels to pay more than $2,500 cash; also, Smith wanted the monthly payments to be $25 instead of $20. The sale was not consummated, and Smith left. About two o'clock of the same afternoon Smith called Kimbrough and asked what Daniels had agreed to do; and Kimbrough informed him that Daniels only had $2,500 in cash. About seven o'clock of the same afternoon Kimbrough, who had discussed the matter further with Daniels, returned to the Smith home. He had with him the contract which had been signed by Mr. and Mrs. Daniels. However, he informed Smith that he, Kimbrough, would purchase as much as $300 of the monthly notes if Smith wanted more cash, and that he thought Daniels would agree to pay $25 per month. Daniels had put $100 earnest money with Kimbrough, and Smith demanded that Kimbrough deliver that to him. Kimbrough informed Smith that it was customary for the real estate agent to hold the earnest money. This seemed to incense Smith. The matter of the expense of the sale; including the real-estate commission, was again discussed, and Smith then informed Kimbrough that he would not pay a commission; whereupon Kimbrough informed Smith that he had not to that time objected to paying the commission, and that he would expect to be paid a commission if Smith sold to Daniels. Kimbrough left and went by the home of Daniels, and refunded to him the earnest money.

About a week thereafter Mrs. Smith called the Daniels, and asked them to come back to the Smith home. That was done. The Smiths and Daniels reached an agreement of sale and purchase of the property at the same price, and on the same terms, as set out in the written agreement Kimbrough had gotten the Daniels to sign, except the monthly payments were increased to $25.

The Smiths and Daniels went to the law office of Mr. Vaughn Watkins in the City of Jackson to have the papers prepared and the deal closed. The $2,500 loan which Smith already had against the property was in favor of an estate of which Mr. Watkins was trustee, and the trustee

agreed to increase that for Daniels to $3,000. Kimbrough, learning that the sale was about to be closed, informed Mr. Watkins in writing of his claim to commission. However, Mr. Smith had already informed Mr. Watkins of the claim for commission by Kimbrough. Mr. Watkins, as a precaution, retained in his hands the amount of the claimed commission. The sale was consummated at the price and on the terms set out in the written contract Kimbrough had procured from the Daniels, except the monthly payments were to be $25 instead of $20.

Mr. Smith testified that he did not think Daniels owed Kimbrough anything. He was asked, "It was your opinion Mr. Daniels didn't owe any money to Mr. Kimbrough at that time?" meaning at the time the deal was being closed in Mr. Watkins' office. He replied, "No sir, I didn't think he owed him any money." "Q. You didn't think Kimbrough was working for Daniels? A. No, sir."

The trial judge concluded that Smith accepted Kimbrough's services, and impliedly agreed to pay him a commission. We cannot, on review, disturb that finding and conclusion unless they are manifestly wrong. Ellis v. Pellegrini, Inc., 163 Miss. 385, 141 So. 273. The trial judge had the benefit of seeing and hearing the witnesses as they testified, and noting their demeanor on the stand. Since he gave judgment for Kimbrough we must assume he resolved all conflicts in favor of Kimbrough.

In Segnitz v. A. Grossenbach Co., 158 Wis. 511, 149 N. W. 159, the Court said that in order to show an implied contract to pay for services, it must appear, first, that they were performed under such circumstances as to give the recipient thereof some reason to think they are not gratuitous, and not performed for some other person, but with the expectation of compensation from the recipient; and, second, the services must have been beneficial to the person sought to be made liable. Again, it is said in Am. Jur. p. 1078, Par. 159: "The owner must say or do something tending to prove that the accepted broker as his

agent in the matter—something more than merely selling to the party whom the broker, while acting as a volunteer, brought to him.'' It is further said in the foregoing paragraph: ''A contract to pay a reasonable commission may also be implied from the owner's acceptance of the voluntary services of a broker rendered with an expectation of payment, provided the owner knew or had reason to believe that such services were rendered with an expectation of payment.''

In Ham & Ham Lead & Zinc Inv. Co. v. Catherine Lead Co., 269 Mo. 654, 192 S. W. 407, 409, it was said: ''If defendant, knowing that plaintiff was endeavoring to sell his mine, acquiesced in, encouraged, and furthered its efforts in that behalf, and accepted the offer of, and sold to, a purchaser whom plaintiff was the sole efficient producing actor in furnishing to defendant, upon terms and conditions which defendant knowingly allowed, or induced plaintiff to offer to such purchaser, then the law would imply a promise on the part of defendant to pay plaintiff . . .''

Now, applying the foregoing rules to the facts of this case, was the trial judge justified in finding that Smith impliedly agreed to pay Kimbrough five per cent on the sale price?

Did Kimbrough expect to be paid? In the first place, he bore no relation to either party indicating that he was working without pay. He did not even know Mr. Smith. In the second place, he informed Mrs. Smith in the beginning he expected a commission. During the first interview between Smith and the purchaser, Kimbrough told Smith he expected a five per cent commission. Certainly no one was justified in thinking Kimbrough was donating his services and efforts.

Who was to pay Kimbrough? He told Mrs. Smith he expected Smith to pay. She reported the conversation to Smith. Kimbrough then told Smith he was supposed to pay. The services continued after that. Smith testified, as set out above, that he did not think Kimbrough was

representing Daniels, or that Daniels owed Kimbrough. The only other person who could have owed him was Smith.

Were the services of value to Smith? The mere recital of Kimbrough's efforts through the various phases of this transaction shows his services were of value. But for them, it is unlikely the sale would have been made.

All of the rules imposing liability on Smith were met in this case—at least, we cannot say the trial judge did not have substantial evidence to support such finding.

Reversed and judgment here for appellant.