ETHRIDGE, Chief Justice.
This suit originated in the Chancery Court of Forrest County, brought by appellee, London, Stetelman & Kirkwood, Inc. (called London), a real estate agency and corporation located in Hattiesburg. The principal defendants were appellant, Mrs. Annie Ruth Smith, and her husband, Francis Glen Smith, residents of Lake Charles, Louisiana. Other defendants were Louis C. Cadenhead, a resident of Baton Rouge, Louisiana, and Forrest Royal Corporation, a Louisiana corporation. The suit, based upon an attachment of certain property owned by Mrs. Smith, was to recover a real estate agent’s commission of $3600 for the sale of certain real property owned by Mrs. Smith in Hat-tiesburg. The chancery court granted London the requested decree for that amount. This appeal presents two questions: (1) Whether an implied contract for real estate brokerage services existed between London and Mrs. Smith; and (2) whether London was the efficient, procuring and predominant cause of the sale of her property, and thus entitled to a commission for such sale. The trial court was warranted in finding *151 the following facts, which although lengthy are essential to understanding of the issues.
I.
Mrs. Smith owned some land in the City of Hattiesburg which was suitable for an apartment building. Her husband, Glen Smith, conveyed it to her in 1950. M. E. Stetelman, a realtor with complainant (London), stated that several days before April 11, 1963, he called Mr. Smith in Lake Charles, Louisiana, and told him he would like to negotiate, for a commission, the sale of the property in Hattiesburg. He then thought that Mr. Smith rather than his wife was the owner. Smith stated that the people in Hattiesburg were not cognizant of the value, and the prospects who had talked to Jiim were offering only $25,000 to $30,-000. Stetelman asked him if he would sell for $60,000, to which Smith replied that he would be definitely interested. Stetelman then explained in some detail that the highest and best use of the property was for a multi-unit or apartment house. He conceived and developed this method of marketing this property. Smith said that he would talk to his wife, because actually the title was in her name, but that he would pay Stetelman a six percent commission to sell it, and suggested that he be mailed an authorization for the agency.
Stetelman mailed Smith a letter describing in detail his method of valuing the property for a sale of $60,000, and a letter authorizing London to serve as agent. Mrs. Smith signed the authority to London to proceed in negotiating the sale for $60,000 cash, including six percent sales commission. If London had not negotiated a satisfactory contract to sell within ninety days from April 18, 1963, the offer by her would he automatically void. The ninety days passed without the London agency getting any purchaser.
In early August 1963, Grady Harrison, an old friend of C. L. Kirkwood, who also worked for the London agency, contacted Xirkwood and told him that he was looking for an apartment-house location for an investor friend in Baton Rouge. It later developed that this person was Louis C. Ca-denhead. The chancellor found on ample evidence that Harrison was acting for and representing Cadenhead. Kirkwood, for London, told Harrison that the property had been listed for $60,000, including six percent sales commission, the listing had expired, but he would contact the Smiths and see if they still wanted to sell. Harrison requested him to do that.
In September 1963, Kirkwood telephoned Mr. Smith and advised him he was working with a prospect for purchase of the Smith property. He asked Smith whether they still wanted to sell it, and Smith replied they did and they wanted to sell on terms which would avoid any excessive capital gains or income tax. Smith told Kirkwood to “go ahead and get it and send it to us— that is, the proposition from the prospective purchaser.” At that time he did not discuss on the telephone a sales commission. Kirkwood advised Harrison that the property could be purchased, and Harrison wrote him requesting specific terms. Later Kirkwood had a telephone conversation with Smith, in which they discussed the terms, a certain amount of cash, mortgage, release of a portion of the property for construction, etc. Smith asked Kirkwood to explain the matter to D. T. Irby of Hat-tiesburg, Mrs. Smith’s brother, who Smith said was handling the property for her. In October 1963 Kirkwood talked with Irby, who advised him that he expected to receive some compensation for handling the property. Kirkwood replied that his firm could not pay Irby, since he was not a licensed broker, but he should look to the owners of the property for any compensation. However, Irby told him that the terms looked all right and he would so advise Mr. and Mrs. Smith.
On October 7, 1963, Kirkwood wrote Harrison explaining his conversation with Irby, and Harrison requested that he go ahead and prepare a purchase contract. On October 21 Kirkwood wrote Harrison en *152 closing a proposed contract to purchase the property with a deposit of $500 on a purchase price of $60,000. Cadenhead, as the proposed purchaser, signed this contract on October 23 and it was returned to Kirk-wood, along with Cadenhead’s check for $500 as a good faith deposit. On October 25 Kirkwood wrote Mr. Smith enclosing the contract to purchase, executed by Caden-head at a price of $60,000, and stating if there were any conditions which were not completely clear to call him collect.
In November, in a telephone conversation with Harrison, Kirkwood was advised that Cadenhead and Mr. Smith had been discussing between themselves the contract. These discussions began after he mailed the contract to Smith, and after the Smiths learned the identity of the prospective purchaser. Kirkwood telephoned Smith, who advised him that the seller would like to receive $60,000 net, that is, not to pay a sales commission of $3600 out of the sale price of $60,000. Kirkwood told Smith that the buyer was an able and willing buyer, ready to purchase on terms which were generally satisfactory, and that, if Smith would accept a sale of $63,600, which would net the Smiths $60,000, he should change the contract to that amount, initial it and return it to him, and he felt confident the buyer would pay the price. Mr. Smith stated that he would do so.
Later in November, Harrison told Kirk-wood that Cadenhead and Smith had been discussing the proposition between themselves, and Cadenhead said that the proposition would not be acceptable at that time and wanted Kirkwood to return the earnest money. On November 15 Kirkwood wrote Mr. Smith requesting that he return the contract so he could return the earnest money to Cadenhead. On November 23 Kirkwood sent Cadenhead the $500. When the Smiths returned to Kirkwood the contract executed by Cadenhead, they, of course, had not executed it, but Mrs. Smith had scratched out the $60,000 and inserted a purchase price of $63,600, changed the $500 earnest money to $1,000, and struck out a provision for prepayment privileges to the purchaser after thirteen months.
The Smiths never advised Kirkwood that they had been in direct contact with Caden-head.
Kirkwood learned about Smith selling the property to Cadenhead in April 1964 from a newspaper article. L. A. Rogers was a salesman for J. Ed Turner, Realtor, Inc. In November 1963, Cadenhead requested that the Turner Agency try to purchase the property from the Smiths, or get a listing on it, which Turner did on November 23.
On January 18, 1964, Mr. and Mrs. Smith and Cadenhead signed a contract for the purchase, but this was superseded by a contract of March 18, 1964, correcting the property description. The sale price to Caden-head was $65,500. Irby, Mrs. Smith’s brother, was paid $1,570; the Turner Agency received $3,930 as its commission, and the Smiths received a net of $60,000. This was the same amount for which the Smiths advised Kirkwood they would sell, and he was negotiating with Cadenhead and the Smiths at the time of the listing with Turner. Turner through Rogers got a listing of this property from Mrs. Smith in the later part of November, providing that the Smiths would receive a net of $60,000. She directed that her brother received $1,570 from the sale, for what she and Irby called his expenses, although he was not a licensed broker. Most of the testimony indicated he did very little about the sale, but he and Rogers were friends.
Mrs. Smith admitted that her husband was acting for her in the negotiations; and that she wanted a net of $60,000. She received a letter from Cadenhead shortly after July 18, when the listing with London terminated. When she was in Baton Rouge, she telephoned Cadenhead to discuss the sale. Her husband had advised Kirkwood, she admitted, that the net price to them would be $60,000.
Mr. Smith conceded that he told Kirkwood they wanted $60,000 net, and Kirkwood sug *153 gested raising the sale price to $63,600. They did not want a prepayment privilege, but payment of the purchase price over several years. Kirkwood told him to change the figure to $63,600. The Smiths knew that after July 18 Kirkwood was endeavoring to secure a purchaser on terms acceptable to them. Kirkwood did not indicate to Smith how high Cadenhead would go, because Cadenhead had never told him. He requested Smith to change the contract to $63,600, initial the change, and return it, and he felt sure that would be satisfactory with the purchaser. Neither Cadenhead nor Smith ever told him they had been in direct communication with each other.
The Forrest-Royal Corporation, grantee in the deed from Mrs. Smith, was organized solely for the purpose of constructing and operating the apartments. Cadenhead own- ' ed a substantial interest in it. The Smiths declined his offer of September 9 for $60,-000 and that ended his direct negotiations with them, he said. Between his contacts with Kirkwood and the Turner firm, he talked with the Smiths and was unable to make a deal with them, he asserted, so he told Turner to try it.
II.
The chancery court found that Harrison was the agent of Cadenhead, and Mr. Smith was the agent of his wife, who had knowledge of complainant’s efforts and negotiations. An implied contract existed between Mrs, Smith and the complainant with reference to the transaction, and complainant was “the efficient, procuring and predominate cause of the sale described in this proceeding.” The court held that under all of the circumstances, “equity requires the granting of relief to the complainant.” Hence the final decree gave London a judgment against Mrs. Smith for $3,600 as a reasonable commission of six percent on the sale price of $60,000; and impressed a lien on her property for payment of the judgment. She appealed with supersedeas.
Kimbrough v. Smith, 201 Miss. 202, 209-210, 28 So.2d 850, 853 (1947), held:
* * * In order to show an implied contract to pay for services, it must appear, first, that they were performed under such circumstances as to give the recipient thereof some reason to think they are not gratuitous, and not performed for some other person, but with the expectation of compensation from the recipient; and, second, the services must have been beneficial to the person sought to be made liable. * * * “The owner must say or do something tending to prove that he accepted the broker as his agent in the matter — something more than merely selling to the party whom the broker, while acting as a volunteer, brought to him.” * * “A contract to pay a reasonable commission may also be implied from the owner’s acceptance of the voluntary services of a broker rendered with an expectation of payment, provided the owner knew or had reason to believe that such services were rendered with an expectation of payment.”
To the same effect is Hill v. Capps, 248 Miss. 601, 160 So.2d 186 (1946). See 12 C.J.S. Brokers § 61 (1938).
In the instant case, the services performed by complainant were of such continuity and nature as to give the Smiths ample reason to know that they were not gratuitous, but were performed with an expectation of compensation. The trial court was also justified in concluding that such services were beneficial to the Smiths, and that London was the efficient, procuring, and predominant cause of the sale. Caden-head was a willing and able purchaser. In fact this record shows that he apparently would have been willing to buy the property from the Smiths for a sum in excess of that which he finally paid. London procured a purchaser ready, willing and able to buy, and presented him to the Smiths. Certainly this record contains substantial evidence to support the chancellor’s finding to that effect. Hill v. Capps, 248 Miss. *154 at 613, 160 So.2d at 190 (1964). The broker’s efforts need not be the sole cause of the sale, but must be the predominant cause. Whether a broker may be considered the procuring: cause of a sale depends upon the particular facts and circumstances of each case, and this is ordinarily a question of fact to be resolved by the trier of fact. 12 Am.Jur,2d Brokers §§ 189, 190 (1964).
After the Smiths through London learned of the identity of the purchaser, Cadenhead, the record reflects that there began a series of direct communications between them. The trial court was warranted in finding that in September and October 1963 the Smiths and Irby told Kirkwood to go ahead with negotiations to sell the property, and acting in good faith, Kirkwood did that. The contract which they ultimately signed, through the Turner Agency, called for a net to them of $60,000. This was the same amount for which Kirkwood tendered to the Smiths in good faith an apparently able, ready and willing purchaser. In fact, Mrs. Smith changed the figures to read that sum, but failed to sign the contract which Kirk-wood sent her as executed by Cadenhead. The only difference with the changes was the $1570 which Mrs. Smith insisted on her brother receiving. He was not a licensed broker, and the chancellor apparently concluded that this was not a sufficient variance to justify the Smiths ignoring their implied contract with London. Mrs. Smith bypassed London, which obtained the purchaser ready, willing and able to buy at the price they stipulated; and, while London was continuing to negotiate for a buyer ready, willing and able to pay what Mrs. Smith wanted, she gave the listing to the Turner Agency for the same net price.
In Partee v. Pepple, 197 Miss. 486, 20 So.2d 73 (1944), after the expiration date of the written listing, the parties continued to deal with the property as if a contract was in effect. That was the circumstance here after expiration of the written listing on July 18. In summary, London was prevented from making the sale by the fault of the owner. The agent procured the purchaser to whom the principal (Mrs. Smith) eventually sold; he was ready, willing and able to buy, and the sale was essentially at the price London made available to the principal. Partee v. Pepple, supra.
Affirmed.
BRADY, PATTERSON, INZER and ROBERTSON, JJ., concur.