342 So.2d 1308 (1977)
MAGNOLIA FEDERAL SAVINGS & LOAN ASSOCIATION
v.
RANDAL CRAFT REALTY COMPANY, INC.
No. 48663.
Supreme Court of Mississippi.
March 2, 1977.
*1309 Watkins, Pyle, Ludlam, Winter & Stennis, Robert H. Weaver, Luther S. Ott, Jackson, for appellant.
M. Curtiss McKee, Jackson, for appellee.
Before INZER, PATTERSON and WALKER, JJ.
INZER, Presiding Justice, for the Court:
This is an appeal by Magnolia Federal Savings & Loan Association from a decree of the Chancery Court of the First Judicial District of Hinds County awarding appellee Randal Craft Realty Co., Inc., $11,500 as a real estate commission. Appellee cross appeals contending that it was entitled to a larger sum.
The record reveals that in 1972 Magnolia Federal Savings & Loan Association, hereinafter referred to as Magnolia, was the owner of a building and lot in north Jackson under lease to Franchise Realty Interstate Corporation and occupied by McDonald's, a nationally known hamburger chain. This lease provided, among other things, that in the event the lessor had an offer from someone to purchase the premises, which it desired to accept, notice of such offer would be submitted to the lessee, and that the lessee would have the first option to purchase the property "by giving notice to the lessor of its intention to purchase within the thirty day period at the same price and the same terms of any such offer." This lease had been arranged by Terry Hairston, a real estate agent, and he was to receive as his commission six percent of the lease payments each year until the expiration of the lease. However, there was nothing in writing relative to these payments until after this controversy arose.
In the early part of 1972, Magnolia was advised by the Federal Home Loan Bank that its investment in this property was unauthorized and it would have to dispose *1310 of the property. Magnolia then tried to sell the property to its lessee, Franchise, but Franchise did not display an interest in buying the property. Magnolia then contacted some real estate agents in an attempt to sell the property. On or about August 10, 1972, Craft learned that the property was for sale and acquired listing information from Magnolia. The listing information given to Craft was a gross price of $307,000, with a real estate broker's commission of six percent on the first $50,000 and five percent on the balance. Craft was also instructed that a prospective purchaser would have to assume the payments of the lease commission to Hairston. The listing with Craft was not an exclusive listing.
Craft set about to try to find a buyer for the property. One of the people contacted was David E. Crawley of Kosciusko, who expressed an interest in buying the property as agent for his son and daughter. Craft then prepared certain analysis and appraisal of the property for the prospective purchasers in an attempt to show the Crawleys that the property was a good investment. This required considerable time and effort on the part of Craft.
On August 21, 1972, Craft was advised by Magnolia that it had reduced its purchase price and would sell the property for $275,000 net to Magnolia. Craft then contacted Crawley who agreed to purchase the property at a price of $292,500. This price included a $17,500 broker's fee.
As soon as the agreement was reached, Craft prepared a contract on the standard form for the sale and purchase of real estate. The contract was immediately carried to Magnolia where it was signed by Crawley, Craft and Phillip H. Payment, president of Magnolia. This contract had the following special provisions:
Purchasers and sellers recognize that Franchise Realty Interstate Corporation has an option to purchase herein described property within thirty days from date of notice upon the same terms and conditions set forth herein. If this option is not exercised by Franchise Realty Interstate Corporation, then the contract will then be in full force and effect and this sale shall be closed within 45 days from date of this contract. (Emphasis added).
The contract did not mention the fact that Crawley was assuming the payment of the lease commissions to Hairston, but Crawley understood that he was to assume this payment.
On August 23, Magnolia notified Franchise by letter that it had sold its McDonald's location. The letter stated, "We are enclosing herewith a copy of the contract, so that all of the terms and conditions of the sale will be known to you." The purpose of the letter was to comply with the terms of the lease with reference to the option of Franchise to purchase the property. Nothing was stated in the letter relative to the fact that Hairston was entitled to a commission under the lease. Two days later Magnolia acknowledged by letter to Hairston that he was entitled to a commission under the lease.
On September 4, 1972, Franchise, much to the surprise of all parties, by letter advised Magnolia of its intention to purchase the property in accordance with the purchase and sale agreement. Apparently, there was some discussion between Franchise and Magnolia relative to whether Franchise was required to pay the real estate commission as part of the purchase price. The minutes of Magnolia reflect that the gross price of the property was $292,500 with the association to pay the fee necessary. Thereafter, Payment advised Franchise that the $292,500 was the purchase price that it was obligated to pay under the terms of the lease and contract for sale and that the broker's commission was a matter of contract between the association and Randal Craft and the association would be responsible for any obligation to that broker only. Thereafter, the sale to Franchise was finally closed on December 13, 1972. The minutes of Magnolia of December 13 reflect the following:
President Payment next reported that the sale of McDonald's had been consummated and we had received a gross check in the amount of $288,000, and that the *1311 Association should net approximately $275,000 from the sale proceeds. President Payment was instructed to settle the transaction on McDonald's to Terry Hairston, who was the leasing agent, and with Randal Craft, who was a realtor involved in the sale transaction. President Payment was instructed to report back to the Executive Committee as to his transactions in dealing with Mr. Hairston and Mr. Craft.
It seems clear at this point that Magnolia recognized that the sale of the property was due to the efforts of Craft and it recognized its obligation to pay Craft. However, Mr. Payment made no attempt to settle with Craft but did settle with Hairston. On December 27, 1972, Payment reported to the Board of Directors that he had settled with Hairston and paid him $12,000 but that Craft was not due any commission.
Thereafter, Craft filed this suit. A general demurrer was sustained to the original bill of complaint. Craft then filed an amended bill of complaint which sought recovery on the theory of the resulting or constructive trust. Magnolia answered and incorporated a general demurrer in this answer. This demurrer was overruled. The answer denied that Craft was entitled to recover any amount as a real estate commission.
The chancellor found from the evidence that Craft was entitled to a commission of $17,500, less $6,000 being one-half of the amount paid to Hairston by Magnolia. It was the opinion of the chancellor that Craft was at fault in failing to include in the purchase and sales contract the condition that the purchaser was required to assume the lease commission payable to Hairston. He also found that Magnolia apparently did not carefully examine the contract for sale and purchase before sending it to Franchise and was at fault in failing to see that Franchise was fully advised of the terms that it was required to meet. It was the chancellor's opinion that the disagreement and litigation was brought about by the failure of the parties to see that the full terms and conditions were included in the contract and a decree was entered awarding Craft a money judgment for $11,500, hence this appeal.
On direct appeal Magnolia contends that the chancellor was in error in finding from the facts in this case that Craft was entitled to a commission. Appellant urges that Craft failed to prove a constructive or resulting trust and that the chancellor should have dismissed the bill of complaint. We find no merit in the contention that the chancellor should have dismissed the bill of complaint. The bill prayed for general relief and the chancellor in making a decision was required to determine from the facts and the law whether Craft was entitled to the commission. The chancellor found that Craft was entitled to a commission and in deciding the case we must consider the facts in the light most favorable to Craft, together with all reasonable inferences that may be drawn therefrom. While the proof of this case does not establish a constructive trust, it does establish a quasi-contract or constructive contract. A quasi-contractual obligation closely resembles a constructive trust, one difference being that an action to enforce a contractual obligation seeks to establish personal liability of the defendant to pay over a sum of money, while an action to enforce a constructive trust seeks to recover specific property. A quasi-contract, or constructive contract, is based on the equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another. In this respect the terms "unjust enrichment" and "restitution" are modern designation for the doctrine of "quasi-contracts" and the basis for an action for "unjust enrichment" lies in a promise, which is implied in law, that one will pay to the person entitled thereto which in equity and good conscience is his. 17 C.J.S. Contracts § 6.
In Old Men's Home, Inc. v. Lee's Estate, 191 Miss. 669, 2 So.2d 791 (1941), we pointed out that a quasi or constructive contract rests on the equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another. *1312 It is an obligation created by law, in the absence of any agreement, when and because the acts of the parties or others have placed in the possession of one person money under circumstances that in equity and good conscience he ought not to retain and which in justice and fairness belongs to another.
Furthermore, in Cooke v. Adams, 183 So.2d 925 (Miss. 1966), we held that any conduct of one party from which the other party may draw the inference of a promise is effective as such and the conduct of the parties is viewed as a reasonable man would to determine the existence or not of the contract implied in fact. We also stated:
A promise which is implied in fact is merely a tacit promise, one which is inferred in whole or in part from the expressions other than words by the promisor, and a promise implied in law is one in which neither the words nor the conduct of the party involved are promissory in form or justify an inference of a promise, and the term is used to indicate that the party is under a legally enforceable duty as he would have been, if he had in fact made a promise. Ferrous Products Co. v. Gulf States Trading Co., Tex.Civ.App., 323 S.W.2d 292, affirmed 160 Tex. 399, 332 S.W.2d 310 (1960).
(183 So.2d at 927).
In spite of the foregoing facts, Magnolia argues that Craft was not entitled to a commission as a matter of law because he had knowledge of Franchise's right of first refusal and the right to first refusal prevented the sale to the purchaser procured by Craft. It is argued that this right of refusal constituted an impediment or defect in the title of Magnolia and the sale to Crawley failed on account of this defect. Magnolia contends that there was no agreement that Craft would be paid a fee if Franchise exercised its option. Magnolia relies on the rule of law announced in Best v. Kelley, 22 Wash.2d 257, 155 P.2d 794 (1945), wherein that Court adopted a rule announced in Renick v. Mann, 194 Ky. 251, 238 S.W. 763, where the Kentucky Court of Appeals stated:
The general rule is that a broker is entitled to his commission, who, acting in good faith, procures a purchaser willing, able and ready to take the property upon the terms offered by the principal, and this is true notwithstanding the sale fails because of a defect in the principal's title of which the broker had no notice. But if the broker, at the time he makes the contract with the owner, knows of the defect in his employer's title or knows facts sufficient to put a reasonably prudent person on inquiry, which, if followed with reasonable diligence, would bring to him such knowledge, he is not entitled to recover where the sale fails because of such defect, unless it was the intention of the parties that the employer should subsequently perfect his title in order to perform the contract of sale.
(155 P.2d at 799).
Magnolia points out that this Court adopted this rule and cites Shireman v. Wildberger, 125 Miss. 199, 87 So. 131 (1921) and Stewart v. Harrison, 210 Miss. 750, 50 So.2d 624 (1951). While it is true that this Court has adopted a rule substantially the same as announced by the Washington Court, we are of the opinion, under the facts and circumstances of this case, the rule is not applicable and does not prevent recovery under the theory of a quasi-contract established by the facts in this case.
It is true that Craft was aware that Franchise had the first right of refusal under the terms of its lease, but the lease stated that Franchise had the right to purchase at the same price and under the same terms of the offer. Magnolia advised Craft that it would accept $275,000 net to Magnolia and that Craft would have to adjust the price to include any real estate commission he desired to earn. Craft then secured the contract with Crawley whereby Crawley agreed to purchase the property for $292,500. Included in the purchase price was a real estate commission of $17,500. Magnolia agreed and submitted the same to Franchise. Franchise noticed that included in the sales price was the real estate commission. *1313 Since Franchise was exercising its option to buy at the same price as the property was offered to Crawley, it was only natural for it to inquire about the real estate commission. If one was to be paid Franchise wanted it to go to its broker. After inquiry Magnolia advised Franchise by letter, dated September 29, 1972, which reads in part as follows:
In view of our several telephone conferences held with regard to the decision of Franchise Realty Interstate Corporation to exercise its option to purchase described in Article 27 of the lease, there are two material items of the transaction which should be brought to your attention, so as to avoid any misunderstanding later.
First, the purchase price to the Crawleys as stated in the August 22, 1972, contract of sale is $292,500. I have discussed the matter of possible reduction with our Board of Directors and the Board has concluded that $292,500 is the purchase price which Franchise Realty Interstate Corporation is obligated to pay under the terms of both the lease and the contract of sale.
Next, there is the matter of the broker's commission which has also been discussed with the Board. The broker's commission is a matter of contract between Magnolia Federal Savings and Loan Association and Randall Craft, and the Association will be responsible for any obligations to that broker only. Therefore, no part of the purchase price is to be withheld for the payment of any brokerage fee connected with the transaction.
At this point, the chancellor was certainly justified in finding that Magnolia recognized that Craft was entitled to a commission. Especially is this true since Magnolia admits that the purchase agreement secured by Craft from Crawley was the sole cause of the sale to Franchise and Magnolia collected from Franchise the commission called for in the contract. Under the facts and circumstances of this case, the acts of the parties placed in the hands of Magnolia $17,500 which in equity, good conscience, justice and fairness belongs to Craft. To allow Magnolia to retain the money would allow it to unjustly enrich itself at the expense of Craft, whose efforts Magnolia admits were the sole cause of the sale to Franchise.
We have carefully considered the other errors assigned and find them to be without merit. For the reasons stated we are of the opinion that this case should be affirmed on direct appeal.

CROSS APPEAL
On cross appeal, Craft contends that the chancellor was in error in holding the amount which he was entitled to recover should be reduced to $11,500 because of his failure to put into the contract for sale executed by Crawley and Magnolia the stipulation that Hairston was entitled to a commission under the terms of the lease. This stipulation would have increased the purchase price by the amount of the commission due Hairston. As heretofore pointed out the chancellor was of the opinion that both parties were negligent in failing to put into the contract the stipulation that the purchaser would be liable for the commission due Hairston. It is apparent that the chancellor in holding that Craft and Magnolia were both responsible for this oversight was simply doing equity. Craft having sought equity was required to do equity, and we cannot say the chancellor was manifestly wrong in adjusting the equities. Consequently, we are of the opinion that this case should be affirmed on cross appeal.
This case was considered by the Judges en banc.
AFFIRMED ON DIRECT AND CROSS APPEALS.
All Justices concur, except SUGG, J., who took no part.