574 So.2d 603 (1990)
Gil CARMICHAEL
v.
AGUR REALTY COMPANY, INC.
No. 07-CA-59264.
Supreme Court of Mississippi.
December 12, 1990.
Rehearing Denied January 23, 1991.
*605 Larry L. Lenoir, Mize Lenoir & Laird, Gulfport, for appellant.
Jess H. Dickinson, Vaughn & Dickinson, Patrick Patronas, Eaton & Cottrell, Michael Prestia, Gulfport, for appellee.
Before ROY NOBLE LEE, C.J., and ROBERTSON and SULLIVAN, JJ.
ROBERTSON, Justice, for the court:

I.
Today's appellant sails upwind and challenges a jury's finding that another had authority to bind him to a real estate broker's commission agreement regarding the purchase of a defunct Gulf Coast hotel. He complains as well of the generality of jury instructions regarding the measure of damages.
For the reasons set forth below, we affirm.

II.

A.
First, our cast of characters:
(1) Agur Realty Company, Inc. is a Mississippi corporation organized in 1959, domiciled in Gulfport, Mississippi, and engaged in the general realty and brokerage sales business in the Mississippi Gulf Coast area. Agur was the Plaintiff below and is the Appellee here.
(2) William J. Scully is an adult resident citizen of Gulfport, Mississippi, and is a licensed realtor and broker specializing in the sale of commercial properties. Scully is an employee of Agur Realty and over the last six or seven years, has been involved in approximately eighteen sales of hotels and motels. At all relevant times Scully acted for Agur.
(3) Gil Carmichael is an adult resident citizen of Meridian, Mississippi, with substantial business interests in other communities, particularly including Tuscaloosa, Alabama. Carmichael was one of the Defendants below and is the sole Appellant today.
(4) J. Donald Craven, II, is an adult resident citizen of Tuscaloosa, Alabama, and for a number of years was the manager of the Stafford Inn in Tuscaloosa. Craven was one of the Defendants below but is not an appellant here.

B.
For a number of years, Carmichael spent time in Tuscaloosa in pursuit of his business interests there and was a regular guest at the Stafford Inn. During this course of conduct, Carmichael became acquainted with Craven, and a friendship developed. Craven wished to buy and own a hotel which he would then manage and told Carmichael of this. Carmichael expressed interest in Craven's idea, and, in 1986, Carmichael and Craven came to an informal understanding that, if Craven found a hotel that seemed appropriate, Carmichael would give it a good look and, if the matter appeared feasible financially, Carmichael would consider investing in it with Craven. Carmichael gave Craven a copy of his financial statement, instructing that Craven use it discreetly but, particularly, in approaching possible hotel sellers, to assure them that he, Craven, had the backing of a substantial purchase prospect.
Enter the Howard Johnson's Hotel property on Highway 90 in Biloxi, Mississippi. The hotel was owned by McLean Enterprises of Springfield, Missouri. Its first mortgage holder was H. & J. Enterprises, a subsidiary of Bank of Boston (hereinafter "H. & J.") with an outstanding indebtedness in the vicinity of 3.1 million dollars. Westinghouse Corporation held a second mortgage for some 5 million dollars.
Things were not well at the hotel and McLean determined to explore a sale. In early 1986, McLean Enterprises listed the hotel with Agur Realty for sale. Over the next five or six months, Scully, acting for Agur, explored possible sales, and in the Fall of 1986, became aware of Craven's interest. Acting on McLean's behalf, Scully *606 mailed to Craven a "package" describing the property and its financial circumstances and advising Craven that the hotel was for sale, all of which piqued Craven's interest. Craven told Carmichael of Scully's approach. Craven contacted Scully and discussed plans for Carmichael and himself to come to Biloxi and meet with Scully and take a look at the property. The date set was for January 15, 1987, but, when Craven and Carmichael arrived, they found that H. & J., as first mortgage holder, had closed the hotel and was beginning foreclosure proceedings. Carmichael reports that he was there "just to look at it, to evaluate it and to learn more about hotel properties." He determined that he "couldn't handle it," as it was too large an investment.
In preparation for Craven and Carmichael's visit to Biloxi, Scully had updated himself on the hotel's status and found that, in addition to the substantial mortgage indebtedness, there were sundry back taxes owing as well as outstanding lease agreements covering personal property in the hotel. Scully gave up hope of selling the hotel for McLean.
At the end of the January 15 meeting, Craven expressed a continuing interest in the hotel and asked that Scully keep him advised of developments. Agur's relationship with McLean being defunct, Scully agreed and talked with Craven from time to time. Independently, Scully approached Walker Tueci with the People's Bank of Biloxi in the latter part of February and asked that the bank consider financing a purchase of the hotel for Carmichael and Craven. Craven then wrote to Tueci and sent his and Carmichael's financial statements. The People's Bank declined the proposal.
Meanwhile, the foreclosure sale was scheduled for March 19, 1987. Craven and Scully were in regular telephone contact. By this time McLean was completely out of Agur's picture and, through Scully, Agur had begun to act for Craven and Carmichael, although Carmichael denies the latter. Scully recommended to Craven that Craven and Carmichael submit an offer to H. & J. to purchase the hotel for $3,100,000.00  the amount of the first mortgage. On April 12, 1987, one week prior to foreclosure, Craven (but not Carmichael) came to Gulfport and met with Scully in Agur's office. Craven represented that he and Carmichael were partners. Working feverishly, Scully and Craven began to assemble the structure of the offer. They procured the services of John C. Hoffman, a lawyer in Gulfport, and a Contract of The Sale And Purchase of Real Estate was prepared, using Agur's standard form. The proposed sales price was $3,100,000.00. Hoffman drafted a Real Estate Commission Agreement which, because of its importance, we set forth in full:
REAL ESTATE COMMISSION AGREEMENT
The undersigned hereby acknowledges that Jim Scully of Agur Realty Co. Inc. was the procuring agent in connection with the contract submitted by J. Donald Craven and Gil Carmichael for the purchase of the Howard Johnson Motel, Biloxi, Mississippi. The real estate commission set forth on said contract has been agreed to by J. Donald Craven and Agur Realty but has not been agreed to by Gil Carmichael. The said Gil Carmichael will review the real estate commission and agree or disagree by his signature on this agreement.
Witness our signatures this the 12th day of March, 1987.
 /s/ J. Donald Craven
 J. DONALD CRAVEN II
 /s/ Jim Scully
 AGUR REALTY
 BY: JIM SCULLY
I AGREE/DISAGREE WITH THE REAL ESTATE COMMISSION AS SET FORTH ON THE CONTRACT.
 Gil Carmichael
 GIL CARMICHAEL
Assorted other documents were prepared and executed by Craven on March 12, 1987, and, together with a cover letter, Scully transmitted these to H. & J., Westinghouse and others in interest. Carmichael says that he knew of none of this at the time but *607 acknowledges that, on March 14 on his return trip to Tuscaloosa, Craven stopped in Meridian and delivered the documents to Carmichael. Carmichael admits that he signed the Real Estate Commission Agreement but circled neither "AGREE" nor "DISAGREE" and claims he did this to demonstrate his faith in Craven. Carmichael insists Craven was not authorized to use the Commission Agreement. Parenthetically, a commission pursuant to the agreement based upon a percentage of the sales price contemplated would have amounted to approximately $41,000.00.
All of this came to naught  temporarily  as neither H. & J. nor any other party responded. Instead, H. & J. moved toward foreclosure. Craven came to Biloxi for the sale and the day before met with Scully. Neither Craven nor Scully had any idea that they might successfully bid on the property, but they wanted to make contact with the H. & J. officials and express their interest.
Unrelated to these events, in January, 1987, Biloxi businessman, Tommy Newman, learned through a newspaper article that the Howard Johnson Hotel had been closed. He contacted his accountant and financial advisor and began assembling information for a possible purchase offer. Newman also contacted Walker Tueci at the People's Bank concerning possible financing. At the time, Newman did not know of Craven and Carmichael's interest, nor did Craven and Carmichael know of Newman.
On March 19, 1987, H. & J.'s trustee convened the foreclosure proceeding. Some thirty people attended. Newman was present with his accountant, financial advisor and attorney. Scully and Craven were also there, and, during the course of the proceedings, Scully met Sherwood Bailey, a hotelier with whom he was acquainted. Scully introduced Bailey to Craven and advised of Craven's interest, and Bailey in turn introduced Scully and Craven to Newman. At foreclosure Newman bid $1,900,000.00, but H. & J. bid $2,000,000.00 and acquired title to the hotel, cutting off the interest of the mortgagor and prior owner, McLean Enterprises, as well as that of Westinghouse, the second mortgagee.
Immediately following the foreclosure, Scully urged Craven to contact Newman. The next morning at the Holiday Inn in Biloxi, Craven unexpectedly saw Newman, approached him and suggested that Newman should meet Carmichael. Newman agreed and two days later, on Saturday, March 21, Newman, Craven and Carmichael returned to the Coast and met Newman at the office of Sam LaRosa, Newman's accountant and financial advisor. In short order, Newman and Carmichael reached an agreement to buy the hotel and formed a corporation, NewCar Enterprises, Inc., to that end. Newman and Carmichael were the principal shareholders of NewCar with Craven having only a minor interest.
At NewCar's instance, Newman pursued financing arrangements, while Carmichael negotiated with the Bank of Boston's mortgage subsidiary, H. & J. Matters proceeded apace and on April 16, 1987, NewCar purchased the hotel for $2,225,000.00. Prior to this sale, Scully had claimed a "finder's fee" on behalf of Agur, although the purchase agreement NewCar submitted to H. & J. stated that it had not engaged the services of a broker. Indeed, on April 12  four days prior to NewCar closing the purchase of the hotel  Craven met with Scully and said he considered that Agur and Scully were due no commission. Craven attempted to give Scully a check of $600.00 for his services, but Scully refused.

C.
Miffed at this rebuff, Scully and his company, Agur Realty, sought counsel. A couple of days later, on April 28, 1987, to be exact, Agur filed suit in the Circuit Court of Harrison County, Mississippi, Second Judicial District, naming Carmichael, Craven and NewCar Enterprises as defendants and demanding judgment in the sum of $41,000.00 as a real estate broker's commission. The matter proceeded to trial, and NewCar was dismissed at the end of Agur's case. In due course thereafter, the matter was submitted to the jury with *608 Agur asserting it had been the procuring cause of the sale to NewCar and that, through Craven, Carmichael was bound for Agur's commission on alternative theories of express agency, apparent authority, and joint venture.
In the end, the jury found for Agur in the sum of $25,000.00. On December 4, 1987, the Circuit Court entered judgment in favor of Agur and against Carmichael and Craven, jointly and severally, in that amount. Carmichael moved for a judgment notwithstanding the verdict or, in the alternative, for a new trial, and the Circuit Court denied the motion. Carmichael now appeals to this Court.

III.
Had the March 12 purchase offer borne fruit, we doubt Carmichael would seriously contend he and Craven did not owe Agur a broker's commission. For one thing, Agur's ties to McLean had been severed, and Agur had entered a brokerage relationship with Craven and Carmichael, or at least on the evidence the jury quite reasonably could have so found. Agur had begun to act pursuant to that new relationship. Craven had signed a proposed contract of sale, acknowledging that Agur as broker "is the procuring cause of the sale." Craven and then Carmichael signed the separate real estate commission agreement, stating "that Jim Scully of Agur Realty Co., Inc. was the procuring agent in connection with the contract submitted by J. Donald Craven and Gil Carmichael for the purchase of the Howard Johnson Motel, Biloxi, Mississippi." The question is whether, after that offer fell through, Carmichael and Craven could secure a new partner, Newman, and form a new corporation, NewCar Enterprises, Inc., and purchase the hotel and avoid any obligation to pay Agur and Scully a commission. Of course, there are many reasons why the March 12 purchase offer did not bear fruit, not the least of which was that it was accompanied by no evidence of Craven's ability to perform financially.
Carmichael nevertheless argues that Agur and Scully did nothing to procure the sale. He argues instead that Newman's financial strength is what caused the sale to occur. His argument mixes apples and oranges.
We approach Carmichael's appeal subject to our limited and familiar scope of review. Carmichael argues strenuously that the evidence was such that he was entitled to judgment in his favor notwithstanding the verdict of the jury. Our scope of review in such a posture is as familiar as it is limited. We must look at all of the evidence and in the case of conflict, we must take that which is consistent with the verdict as true. We must as well give Agur the benefit of all reasonable favorable inferences the evidence affords. McMillan v. King, 557 So.2d 519, 522 (Miss. 1990); Stubblefield v. Jesco, Inc., 464 So.2d 47, 54 (Miss. 1984); Paymaster Oil Mill Co. v. Mitchell, 319 So.2d 652, 657 (Miss. 1975).
The point is one of contract. Carmichael and Craven owe Agur a commission if they had a contract and if a condition or term upon which Agur's right to a commission came to pass. We have held repeatedly that a contract such as that Agur and Scully claim  and the jury found  Agur had with Carmichael and Craven does not have to be in writing but may be implied from the circumstances. Smith v. H.C. Bailey Companies, 477 So.2d 224, 234-35 (Miss. 1985); Minter v. Hart, 208 So.2d 169, 170 (Miss. 1968); Hill v. Capps, 248 Miss. 601, 612, 160 So.2d 186, 190 (1964).
Such a contract will be implied if Agur acted with the loyalty a broker owes his principal and performed services for Carmichael and Craven under circumstances giving Carmichael and Craven reason to think the services were not gratuitous but were provided with the expectation of compensation and, further, if it may be said that those services were beneficial to Carmichael and Craven. Smith v. London, Stetelman & Kirkwood, Inc., 185 So.2d 150, 153 (Miss. 1966); Hill v. Capps, 248 Miss. at 611, 160 So.2d at 190; Kimbrough v. Smith, 201 Miss. 202, 209-210, 28 So.2d 850, 853 (1947). Where, as here, *609 the existence of a contract for realty and brokerage services is disputed, the matter becomes one of fact to be resolved by the trier of fact. Hill v. Capps, 248 Miss. at 611-612, 160 So.2d at 190; see also Mitchell v. Rawls, 493 So.2d 361, 363-64 (Miss. 1986).
Conventionally, before a broker is entitled to a commission, he must first call the purchaser's attention to the property and begin negotiations that lead to a sale. Hill v. Capps, 248 Miss. at 613, 160 So.2d at 191. In common parlance, the broker must be a procuring cause of the sale, although how much of a cause he must be is a function of contract. Absent contract to the contrary, the rule is settled that the broker's efforts need not be the sole cause of the sale, merely a predominant one. Smith v. London, Stetelman & Kirkwood, Inc., 185 So.2d at 154. Pursuant to a(n implied) brokerage agreement, the broker must with diligence and fidelity provide substantial services to his principal  be he seller or buyer  which services become a substantial causal predicate to a consummated sale. Where, as here, the facts are in dispute, the question whether the broker is sufficiently a procuring cause of the sale is one for the trier of fact. Smith v. H.C. Bailey Companies, 477 So.2d at 234-235; Smith v. London, Stetelman & Kirkwood, Inc., 185 So.2d at 154; Hill v. Capps, 248 Miss. at 613, 160 So.2d at 191.
It is common to think of the broker as acting for owners and sellers of the property and that liability for any commission rests with the owner/seller. Less frequently the buyer engages the broker and pays a commission, and there is no reason on principle why such an agreement may not be reached. We have enforced buyer-pay-commission brokerage contracts. Crowe v. Beard, 394 So.2d 899 (Miss. 1981). Beyond that, there are a great many cases where the seller/owner tells "his" broker the net proceeds he expects from the sale and then empowers the broker to add a commission before establishing a sales price at which the property will be offered. In such cases, the economic reality is that the buyer pays the commission, although the formal incidence of the obligation may remain with the owner/seller.
The conventional sale of real property may find an owner listing his property with the broker who then procures a purchaser and all is sweet and simple. In the real world, people do not always respect convention, and within our reports are a number of such cases where we have nevertheless upheld the broker's entitlement to his commission. See Magnolia Federal Savings and Loan Assoc. v. Randal Craft Realty Co., 342 So.2d 1308 (Miss. 1977) (broker procures sale; lessee holding right of first refusal, exercised rights and purchased on terms broker had negotiated with other; held, broker entitled to commission though broker had no direct contact with lessee); Minter v. Hart, 208 So.2d at 171 (broker procures sale but owner decides he does not want to sell); Smith v. London, Stetelman & Kirkwood, Inc., 185 So.2d at 151-52 (after broker procures sale, seller goes through another broker to consummate sale); Hill v. Capps, 248 Miss. 601, 160 So.2d 186 (1964) (broker negotiated sale to two parties who had decided they wanted to buy property; without intervention of broker, prospective purchasers invited a cousin to come in and take a one-half interest; broker held entitled to commission though he had no direct contact with the cousin); Lizana v. Brown Realty Co., 146 Miss. 758, 765, 111 So. 867, 868 (1927) (broker procures sale but owner decides he does not want to sell).
Our legal standards before us, and, as well, our limited scope of review and the view it commands we take of the evidence, we believe the jury's finding that Agur was a procuring cause on sound ground. We have evidence in the form of the March 12, 1987, contract submitted to H. & J. signed by Craven acknowledging that "broker is the procuring cause of this sale." Then there is the real estate commission agreement, signed by Craven and Scully the same day acknowledging that Agur "was the procuring agent in connection with the contract submitted by J. Donald Craven and Gil Carmichael for the purchase of the Howard Johnston Motel," which agreement *610 we know was later signed by Carmichael. At least as early as March 12, 1987, Agur held an implied brokerage contract with Craven, if not Carmichael, as well, and that Agur was a procuring cause of the ultimate sale. There is no question but that through Agur, Craven and Carmichael first learned of and approached H. & J. After foreclosure, through Agur and Scully, Craven first met Newman. Scully encouraged Craven to pursue Newman to the obvious end that an attractive purchase offer be made to H. & J. That Craven plus Carmichael then pursued Newman independently and in effect froze Agur and Scully out of their subsequent plans and negotiations does not erase the fact that Agur, with diligence and fidelity to Craven and Carmichael, played a substantial role in setting in motion the chain of events that led inexorably to a successful purchase of the Howard Johnson Hotel.
Carmichael argues strenuously that, because the March 12 proposal was not accepted, Carmichael's and Craven's obligations to Agur and Scully ended. Again, this is a matter of contract and again written form is not required for enforceability or modification. We regard it common sense that with a transaction of the size of this considerable negotiations and repackaging of proposals may occur. Quite understandably, Carmichael and Craven sought a new partner, Newman, and organized a new corporation. But if Agur and Scully were entitled to a commission by virtue of their agreement with Craven and Carmichael on March 12, they do not lose that entitlement because Carmichael on his own did not have the financial wherewithal to pull off the purchase. Absent some breach on the part of Agur and Scully, Carmichael and Craven had no authority to shed their obligations and to pursue the purchase alone or with a new partner. See Hill v. Capps, 248 Miss. at 616, 160 So.2d at 192; see also, Magnolia Federal Savings & Loan Assn. v. Randal Craft Realty Co., 342 So.2d 1308, 1313 (Miss. 1977); Smith v. London Stetelman & Kirkwood, Inc., 185 So.2d 150, 153-54 (Miss. 1966).
The questions of implied contract and procuring cause have been submitted to the jury. The jury has found for Agur. Viewing the evidence as we must, the verdict is secure.

IV.
Carmichael's more serious argument is that, assuming arguendo that Craven may have been bound to Agur and Scully, he, Carmichael, did nothing to bind himself and, furthermore, Craven had no authority to bind him. We note parenthetically that Agur and Scully originally sued Carmichael on an agency theory. At trial they broadened their approach to include a claim that Craven and Carmichael were partners or joint venturers. Carmichael noted the new theory but did not object, and we regard the matter as having been tried by implied consent. Miss.R.Civ.P., 15(b). In point of fact, the Court submitted the case to the jury on four alternative theories advanced by Agur and Scully: (1) express authority; (2) implied authority; (3) apparent authority; and (4) joint venture.
On appeal, Carmichael does not object to the form or content of the instructions embodying these theories, only the adequacy of the evidence that they be submitted at all. Accordingly, if the evidence be legally sufficient on any one of these four theories, the judgment on liability in favor of Agur and against Carmichael must be affirmed.
Agur's most promising theory is that Carmichael and Craven were acting in concert so that in dealing with third persons one had the power to bind the other. Our law provides two labels for such arrangements: partnership and joint venture, and acknowledges no difference between the two except, a joint venture is thought to have more limited and circumscribed boundaries. Hults v. Tillman, 480 So.2d 1134, 1141 (Miss. 1985). The two may be created in the same ways, Hults, 480 So.2d at 1141. Each may exist as an oral or written, express or implied agreement among its members. Crowe, 394 So.2d at 902. The proof suggests an oral understanding between Carmichael and Craven *611 to associate to buy the Howard Johnson Hotel, to carry out a single business enterprise for profit, for which purpose they combined their property, money, efforts, skill and knowledge. Hults, 480 So.2d at 1142; Sample v. Romine, 193 Miss. 706, 726, 8 So.2d 257, 260 (1942). As is often the case, one venturer  Carmichael  is to provide funding while the other  Craven  contributes only his labor, skill or experience. See Boxwell v. Champagne, 229 Miss. 355, 365, 91 So.2d 256, 261 (1956).
What is important for the moment is that, in such a joint venture, each venturer has the power to bind the other adventurers and subject all to liabilities to third persons in matters strictly within the scope of the joint enterprise. Jim Murphy & Associates, Inc. v. Lebleu, 511 So.2d 886, 891-92 (Miss. 1987).
Here there is no formal joint venture agreement between Carmichael and Craven. On the other hand, the evidence is such that the jury could reasonably have found that the two intended to and did associate themselves in such a venture to purchase the Howard Johnson Hotel. At the very least, the jury could reasonably have found that the agreement came into being when Carmichael came to the Gulf Coast on January 15, 1987, and together with Craven, met Scully and discussed the possible purchase of the Howard Johnson Hotel. That Carmichael had given Craven his financial statement to show hotel prospects could lead reasonable (jurors') minds to believe that a joint venture had been formed to acquire a suitable hotel property. The fact of the joint venture agreement was confirmed when the March 12 offer was put together and when it was presented to Carmichael on March 14 and not rejected.
Carmichael presented to the jury extensive testimony regarding his state of mind. We have studied that testimony, and we regard it within the jury's prerogative to have rejected it. For example, the jury quite reasonably could have found that Carmichael's signing the March 12 Real Estate Commission Agreement signified his understanding thereof and assent thereto and that his claim at trial that he was shocked by it and that he did not confer upon Craven the authority to use it was but self-serving second thoughts. Conceding that there may have been doubts in Carmichael's mind earlier whether he was in a contractual relationship with Agur and Scully, rational persons could certainly find that once he received and signed the Real Estate Commission Agreement of March 12, those doubts were no longer reasonable.
In any event, the jury's verdict is legally sufficient on the existence of an agreement between Carmichael and Craven to act in concert, an agreement like unto that our law labels a joint venture agreement, and Craven as one of the joint venturers had the legal power to bind Carmichael and subject him to liability to third persons in matters within the scope of the joint enterprise. Carmichael thus would have been bound had the March 12 purchase proposal borne fruit.
Again having in mind our limited scope of review, we hold that the Circuit Court was correct when it denied Carmichael's motion for judgment notwithstanding the verdict.

V.
Carmichael next challenges the Court's instructions to the jury regarding the quantum of damages. Carmichael identifies three instructions, Nos. P-2,[1] *612 P-4[2] and P-11,[3] each of which in pertinent part instructs the jury, if it finds for Agur on the question of liability, it should measure damages by reference to "the reasonable value" of the services Agur rendered. Carmichael argues that these instructions are too vague and general and do not afford sufficient guidance that the $25,000.00 award the jury returned may be affirmed.
Of course damages instructions must furnish a guide to the jury. Carmichael begins with this premise and argues that an instruction to find the "reasonable value of services" standing alone is inadequate and must be accompanied with guidelines of consideration.
In Gerodetti v. Broadacres, Inc., 363 So.2d 265 (Miss. 1978), the Court considered an instruction that read:
The Court further instructs the Jury that your verdict should be in favor of the Plaintiff and that you should award to the Plaintiff such damages as you find have been proven to you by a preponderance of the evidence were proximately caused by the failure of said Defendant to construct said buildings according to plans and specifications.
Gerodetti, 363 So.2d at 267. We said this instruction did not properly advise the jury of the elements of damages it should consider. Gerodetti, 363 So.2d at 267. The shortcoming of the instruction was the omission of a measurement of damages as either the cost rule or the diminished value rule. Gerodetti, 363 So.2d at 268.
Gerodetti relied in part upon Dickerson Construction Company v. Process Engineering Company, Inc., 341 So.2d 646 (Miss. 1977). In Dickerson Construction Company, the Court contemplated an instruction which charged the jury to consider "all damages, if any, which will be caused as a result of business interruption during permanent repairs made to the building." Dickerson Construction Company, 341 So.2d at 652. Again the Court found the instruction wanting in that it allowed the jury to determine the measure of damages. Dickerson Construction Company, 341 So.2d at 653. Copiah Dairies, Inc., v. Addkison, 247 Miss. 327, 337, 153 So.2d 689, 693 (1963); Alabama Great Southern Railroad Company v. Broach, 238 Miss. 618, 622, 119 So.2d 923, 925 (1960), and Sears, Roebuck & Company v. Creekmore, 199 Miss. 48, 64, 23 So.2d 250, 254 (1945), are to like effect.
Instructions Nos. P-2, P-4 and P-11 do not suffer the deficiencies found fatal in the above cases. First, today's instructions refer to services that were to be performed under contract. The parties to the contract are named. The predicate to liability is sufficiently announced. Damages measured by the "reasonable value" of services may as easily be found as negligence measured by want of reasonable care. The challenged instructions, while general, were tied to the parties, their agreement, and the evidence and are no more general than the rule of law itself. The point is without merit.

VI.
Carmichael finally argues that the Court erred in refusing his proffered instructions *613 Nos. D-9 and D-10.[4]
The point is procedurally preserved by the mere tendering of the instructions, suggesting that they are correct and asking the Court to submit them to the jury. This in and of itself affords counsel opposite fair notice of the party's position and the Court an opportunity to pass upon the matter. When the instructions are refused, there is no reason why we should thereafter require an objection to the refusal unless we are to place a value upon redundancy and nonsense.
On the merits, we resort to our familiar rule that we will not reverse for failure to grant proffered jury instruction where all of the instructions taken together fairly announce the applicable law. See, e.g., Mississippi Farm Bureau Mutual Insurance Co. v. Todd, 492 So.2d 919, 934 (Miss. 1986). We have reviewed the Court's entire charge to the jury. Assuming, without deciding, that these two instructions are in proper form  and Jury Instruction No. 10 appears particularly dubious, we hold that the Court's charge as a whole fairly announces the law and that no error requiring reversal was committed when the Court refused to submit these instructions.
AFFIRMED.
ROY NOBLE LEE, C.J., HAWKINS, P.J., and PRATHER, SULLIVAN and PITTMAN, JJ., concur.
DAN M. LEE, P.J., dissents.
ANDERSON and BLASS, JJ., not participating.
NOTES
[1] INSTRUCTION NO. P-2
* * * * * *
... The Plaintiff claims in this case that Donald Craven was the agent of Gil Carmichael when Agur Realty was engaged to assist in the purchase of the Howard Johnson's Motel. If you find from a preponderance of the evidence that Donald Craven engaged the services of Agur Realty on behalf of himself and Gil Carmichael, and that Donald Craven had either express, implied, or apparent authority to act on behalf of Gil Carmichael in this manner, then you will return a verdict for the Plaintiff for the reasonable value of the services rendered to Gil Carmichael.
[2] INSTRUCTION NO. P-4
* * * * * *
... If you find that the Defendants, Donald Craven and Gil Carmichael, were joint venturers and that the Plaintiff was contracted to perform a service on behalf of this joint venture, and that such service was provided, then you will return a verdict in favor of the Plaintiff and against each member of the joint venture for the reasonable value of such services.
[3] INSTRUCTION NO. P-11
* * * * * *
... The Court instructs the Jury that if you find from a preponderance of the evidence that Defendant was the agent of Defendant Gil Carmichael, and that Craven entered into a contractual agreement with the Plaintiff and that as a result the Plaintiff performed certain services on behalf of the Defendants and their attempted purchase of the Howard Johnson Motel, then you will return a verdict in favor of the Plaintiff for the reasonable value of such services.
[4] These instructions read as follow:

JURY INSTRUCTION NO. 9
The Court instructs the jury that the Plaintiff must prove by a preponderance of the evidence the monetary loss or damage it has suffered through the breach of contract by the defendants, if you find any such breach, and unless you find that the amount of such loss has been established by a preponderance of the evidence, if any, you must find for the Defendants.
JURY INSTRUCTION NO. 10
The Court instructs the jury that the Plaintiff has not established the amount of its damages, if any, for any breach of contract, if any, and if you find such a breach you can only award nominal damages.